# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

PEOPLE v STEVENS

Docket No. 149380. Argued March 11, 2015. Decided July 23, 2015.

Adam B. Stevens was convicted of second-degree murder, MCL 750.317, and second-degree child abuse, MCL 750.136b(3), following a jury trial in the Jackson Circuit Court, John G. McBain, J. The charges stemmed from the death of defendant's three-month-old son, Kian Stevens. The prosecution alleged that defendant caused Kian's death by either shaking him or slamming him against an object. Defendant alleged that he tripped and fell while holding Kian, and that as he fell, he lost control of Kian, who fell to the floor. Defendant denied shaking or slamming Kian. Defendant appealed his convictions and sentences. In an unpublished opinion per curiam, the Court of Appeals, METER, P.J., and RIORDAN, J. (SERVITTO, J., dissenting), affirmed. Defendant sought leave to appeal. The Supreme Court ordered and heard oral argument on whether to grant the application or take other peremptory action. 497 Mich 898 (2014).

In a unanimous opinion by Justice BERNSTEIN, the Supreme Court *held*:

A judge's conduct pierces the veil of judicial impartiality and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review. Rather, the judgment must be reversed and the case remanded for a new trial. In this case, defendant challenged the judge's questioning of himself and his expert witness, to which defense counsel objected vigorously at trial. The judge's questions implied partiality, were argumentative, invaded the role of the prosecutor, and did not clarify testimony or elicit additional relevant information. The judge's response to objections reflected an erroneous belief that his power to question witnesses had no limitations. The judge's tone and demeanor also weighed in favor of holding that the judge improperly created the appearance of bias against defendant. The words used by the judge and

the sequence of his questions projected incredulity, bias, and hostility. The complexity of the issues presented during trial did not warrant the extent of the judicial intervention that occurred, and the questioning targeted defendant's case. Although the judge gave a general curative instruction at the end of the trial, the instruction did not overcome the appearance of bias the judge exhibited against the defense throughout the trial. Considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against defendant, piercing the judicial veil and depriving defendant of his right to a fair trial.

Reversed and remanded for a new trial before a different judge.

©2015 State of Michigan

# OPINION

Chief Justice:                Justices:
Robert P. Young, Jr.    Stephen J. Markman
                                     Mary Beth Kelly
                                     Brian K. Zahra
                                     Bridget M. McCormack
                                     David F. Viviano
                                     Richard H. Bernstein

FILED  July 23, 2015

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v                                                                   No. 149380

ADAM BENJAMIN STEVENS,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

BERNSTEIN, J.

This case requires us to address the appropriate standard for determining when a trial judge's conduct in front of a jury has deprived a party of a fair and impartial trial, and whether that standard was met in this case.

A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the

appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. When the issue is preserved and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review. Rather, the judgment must be reversed and the case remanded for a new trial.

In this case, the trial judge's conduct with respect to defendant's expert witness pierced the veil of judicial impartiality, depriving defendant of the right to a fair trial. As a result, the judgment of the Court of Appeals is reversed and the case is remanded for a new trial before a different judge.

## I. FACTS AND PROCEDURAL HISTORY

On August 19, 2010, three-month-old Kian Stevens died. Defendant, Kian's father, was eventually charged with first-degree felony murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2), in connection with Kian's death. A jury trial was held over the course of eight days. The prosecution's theory was that defendant caused Kian's death either by shaking him or by slamming him against an object. Kian's mother, Crystal Anderson, testified that defendant had been living with her for about a year when Kian died. On August 19, at around 12:30 a.m., Anderson was awakened by

2

the sound of Kian crying. Upon entering the living room, she found defendant holding Kian upside down. Soon after, the child stopped breathing. While Anderson called 911, defendant performed CPR. Kian was placed on life support at a local hospital and then flown to Mott Children's Hospital. At Mott, Kian was declared brain dead, having suffered hemorrhaging to the brain. Dr. Bethany Mohr, the director of the child protection team at Mott, testified for the prosecution as an expert in pediatric child abuse. Mohr opined that Kian's injuries suggested that Kian had suffered head trauma caused by physical abuse. Dr. Jeffrey Jentzen, a medical examiner who performed the autopsy on Kian, testified for the prosecution as an expert in forensic pathology. He testified that Kian died from abusive head trauma and that the cause of death was homicide. Jentzen was also called as a rebuttal witness.

Defendant testified on his own behalf. Defendant stated that, on the morning in question, he had gotten out of bed to get a drink of water when he noticed Kian moving around in his bassinet. When he picked Kian up to comfort him, defendant tripped on a toy truck lying on the floor and fell forward. As defendant fell, he lost control of Kian, who fell to the floor. Defendant denied shaking or slamming Kian. Defendant admitted that he did not tell Anderson until several weeks after the incident that he had dropped Kian. Defendant further testified that, during an interview with police detectives, he denied dropping Kian because he felt intimidated.

Dr. Mark Shuman, an associate medical examiner for Miami-Dade County in Florida, testified for the defense as an expert in forensic pathology. Shuman testified that

3

it was possible that Kian died from injuries sustained in a short fall[1] from defendant's arms to the floor. Shuman stated that he did not believe a baby could die from being shaken vigorously, but also testified that forensic pathologists were generally divided on the issue. Shuman noted that even if shaking could cause death, Kian did not show signs of any neck injury, trauma that would be present if vigorous shaking had occurred. However, Shuman acknowledged that the cause of death could be homicide if one believed certain testimony offered by the prosecution's witnesses.

Ultimately, defendant was acquitted of the first-degree charges but was convicted of two lesser charges: second-degree murder, MCL 750.317, and second-degree child abuse, MCL 750.136b(3). The trial judge sentenced defendant to concurrent prison terms of 25 to 50 years for the murder conviction and 32 to 48 months for the child abuse conviction.

On appeal, defendant argued that he was denied a fair trial because the trial judge, through his questioning of defendant and defendant's expert, demonstrated partiality in front of the jury. In a split opinion, the Court of Appeals rejected this claim and affirmed the convictions. The majority held that "[c]laims of judicial misconduct are reviewed to determine whether the trial court's comments or conduct evidenced partiality that could have influenced the jury to a party's detriment." *People v Stevens*, unpublished opinion per curiam of the Court of Appeals, issued April 10, 2014 (Docket No. 309481), p 3, citing *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996). The majority

---

[1] During trial, the term "short fall" was generally used to refer to a child's fall from a height of 4 feet or less.

4

stated that, while a judge may ask questions of witnesses, certain questions could indicate improper partiality:

> The appropriate test to determine whether the trial court's comments or conduct pierced the veil of judicial impartiality is whether the trial court's conduct or comments were of such a nature as to unduly influence the jury and thereby deprive the appellant of his right to a fair and impartial trial. [*Id.*, quoting *People v Conley*, 270 Mich App 301, 308; 715 NW2d 377 (2006) (quotation marks omitted).]

Applying this standard, the majority held that the trial judge's questions did not pierce the veil of judicial impartiality.

The dissent, however, applied a different standard and came to the opposite conclusion. The dissent stated that, to determine whether a judge's conduct pierced the veil of impartiality, a reviewing court must consider whether the conduct " '*may* well have unjustifiably aroused suspicion in the mind of the jury as to a witness' credibility, . . . and whether partiality *quite possibly could* have influenced the jury to the detriment of defendant's case.' " *Stevens* (SERVITTO, J., dissenting), unpub op at 1, quoting *People v Sterling*, 154 Mich App 223, 228; 397 NW2d 182 (1986). The dissent determined that, on numerous occasions during the trial, the judge had inappropriately questioned defense witnesses, undermining the credibility of those witnesses and indicating judicial partiality. Consequently, the dissent concluded that the judge's conduct pierced the veil of impartiality, requiring reversal.

## II. STANDARD OF REVIEW

The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006); *In re Susser Estate*, 254 Mich App 232, 236-237; 657

5

NW2d 147 (2002). As discussed in greater detail later in this opinion, once a reviewing court has concluded that judicial misconduct has denied the defendant a fair trial, a structural error has occurred and automatic reversal is required. *Arizona v Fulminante*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

## III. APPROPRIATE STANDARD FOR DETERMINING JUDICIAL PARTIALITY

This Court has noted that "great care should be exercised that the court does not indicate its own opinion and does not lay undue stress upon particular features of a witness' testimony that might, in the eyes of the jury, tend to impeach [the witness]." *Simpson v Burton*, 328 Mich 557, 564; 44 NW2d 178 (1950). However, there is no clear line of precedent establishing the appropriate test in this state to determine whether a trial judge's conduct pierced the veil of judicial impartiality. Indeed, the disagreement between the members of the Court of Appeals panel in this case illustrates the uncertainty that has arisen with respect to this issue. We take this opportunity to clarify and articulate the proper standard a reviewing court must apply.

## A. PRIOR ARTICULATIONS OF THE STANDARD

The chain of cases cited by the Court of Appeals majority and dissent leads us back to *Simpson*. In that case, this Court stated that the judge's questions "in some instances *may well have* unjustifiably aroused suspicion in the mind of the jury as to defendant's credibility . . . ." *Id.* at 563-564 (emphasis added). Approximately seven years later, this Court articulated a similar standard: whether it "*may well have* created an atmosphere of prejudice which deprived defendant of a fair trial and contributed to his

6

conviction." *People v Cole*, 349 Mich 175, 200; 84 NW2d 711 (1957) (emphasis added). Numerous cases have since adopted the "may well have" standard.[2]

Unfortunately, application of the standard set forth in *Simpson* and *Cole* has been inconsistent. In *People v Young*, 364 Mich 554, 558; 111 NW2d 870 (1961), this Court cited *Cole* for the proposition that we have "not hesitated to reverse for new trial when the trial judge's questions or comments were such as to place his *great influence* on one side or the other in relation to issues which our law leaves to jury verdict." (Emphasis added.) In *People v Wilson*, 21 Mich App 36, 37; 174 NW2d 914 (1969), the Court of Appeals cited *Cole* in stating that the standard was "whether the trial judge's comments or questions were of such a nature as to *unduly influence* the jury and thereby deprive the appellant of his right to a fair and impartial trial." (Emphasis added.) Neither the phrase "great influence" nor the phrase "unduly influence" appears anywhere in *Cole*; *Cole* instead uses the "may well have" language.

### B. NEW STANDARD

It appears that this early split explains the divide between the two formulations of the standard seen in the Court of Appeals' opinions in this case. Having reviewed how the different formulations of the test emerged, we now turn to the more difficult question of how to settle on a clear standard. Both the "unduly influence" standard and the "may well have . . . quite possibly could have" standard lack any substantive guidance in

---

[2] See, e.g., *People v Davis*, 216 Mich App 47, 50-52; 549 NW2d 1 (1996); *Cheeks*, 216 Mich App at 480; *People v Conyers*, 194 Mich App 395, 405; 487 NW2d 787 (1992); *Sterling*, 154 Mich App at 228; *People v Redfern*, 71 Mich App 452, 457; 248 NW2d 582 (1976); *People v Smith*, 64 Mich App 263, 267; 235 NW2d 754 (1975).

7

explaining what exactly a reviewing court must examine when determining whether error requiring reversal occurred. In order to provide clarity going forward, we thus propose a new articulation of the appropriate test, grounded in a criminal defendant's right to a fair and impartial jury trial. See *Cole*, 349 Mich at 200; *People v Bigge*, 297 Mich 58, 72; 297 NW 70 (1941) ("Once the door is open for allowing the opinion of the court to be impressed upon jurors that one charged with crime is guilty of the offense, the fundamental right of trial by jury is impaired."). A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality. *Wilson*, 21 Mich App at 37-38 ("If an examination of the record reveals that the veil of judicial impartiality was pierced by the trial judge, the case must be reversed."); *People v Bedsole*, 15 Mich App 459, 462; 166 NW2d 642 (1969) ("The veil of judicial impartiality should not have been pierced by the trial judge on this occasion."). A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party.[3]

---

[3] Consistent with the principle that we do not apply harmless-error review to claims of judicial partiality, discussed later in this opinion, the reviewing court must determine whether the judge's conduct improperly influenced the jury without considering the weight of the evidence presented against the aggrieved party or whether the conduct *actually* contributed to the jury's verdict. Rather, in considering improper influence, the reviewing court must determine whether the judge's conduct was sufficiently severe and clear so as to create the appearance of bias against the aggrieved party. It is the existence of this appearance that is considered improper influence, and the nonexhaustive factors outlined within this opinion are targeted at determining whether the judge's conduct created an appearance of bias.

8

This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality. See, e.g., *Young*, 364 Mich at 559 (holding that the judge's colloquy with the defendant's medical expert improperly invaded the province of the jury on the crucial issue which was theirs to decide); *McMillan v Castro*, 405 F3d 405, 410 (CA 6, 2005) (stating that reviewing courts must consider "whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [judge]'s conduct falls demonstrably outside this range so as to constitute hostility or bias."). Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors. See *Cole*, 349 Mich at 199-200 (concluding that certain judicial comments "standing alone" did not constitute error, but "taken together" the errors deprived the defendant of a fair trial).

These errors must be considered within the context of a given case, i.e., the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. See *Freudeman v Landing of Canton*, 702 F3d 318, 328 (CA 6, 2012), citing *McMillan*, 405 F3d at 409-410. This list of factors is not intended to be exhaustive. Reviewing courts may consider additional factors if they are

9

relevant to the determination of partiality in a particular case. Moreover, the aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury. The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case.

As an initial matter, a reviewing court should consider the nature or type of judicial conduct itself. Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions. See e.g., *Cole*, 349 Mich at 188-200 (noting that improper conduct consisted of the judge's heated cross-examination of a defense witness, giving advice to the prosecutor, and belittling defense counsel); *Young*, 364 Mich at 559 (noting that the judge allowed his disbelief of the defendant's medical expert to become evident to the jury); *People v Neal*, 290 Mich 123, 129; 287 NW 403 (1939) ("Pert remarks and quips from the bench have no place in the trial of a criminal case . . . ."); *Simpson*, 328 Mich at 563-564 (concluding that the judge's questions of the defendant were so "very many in number" that they overstepped the bounds of judicial impartiality); *Loranger v Jageman*, 169 Mich 84, 85-86; 134 NW 967 (1912) (holding that the trial judge inappropriately allowed his impression that the plaintiff had a meritorious case to affect his charge to the jury).

Identifying the nature of the conduct provides the starting point to evaluate whether the conduct overstepped the line of judicial impartiality. For instance, when

10

evaluating a judge's questioning of witnesses, a reviewing court must first bear in mind that such interrogation is generally appropriate under MRE 614(b).[4] This Court has stated that the central object of judicial questioning should be to clarify. See *Young*, 364 Mich at 558; *Simpson*, 328 Mich at 564. Therefore, it is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information. *Simpson*, 328 Mich at 564; *Sterling*, 154 Mich App at 228. Judicial questioning, nevertheless, has boundaries. The Michigan Code of Judicial Conduct states:

> A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear up some obscurity, but the judge should bear in mind that undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on the judge's part toward witnesses . . . may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto. . . . In addressing counsel, litigants, or witnesses, the judge should avoid a controversial manner or tone. A judge should avoid interruptions of counsel in their arguments except to clarify their positions, and should not be tempted to the unnecessary display of learning or a premature judgment. [Code of Judicial Conduct, Canon 3(A)(8).]

It is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally. *Young*, 364 Mich at 558-559. It is essential that the judge "not permit his own views on disputed issues of fact to become apparent to the jury." *Id*. at 558. See also *In re Parkside Housing Project*, 290 Mich 582, 598; 287 NW 571 (1939); *Loranger*, 169 Mich at 86.

---

[4] "The court may interrogate witnesses, whether called by itself or by a party." MRE 614(b).

11

Second, a reviewing court should consider the tone and demeanor the trial judge displayed in front of the jury. Because jurors look to the judge for guidance and instruction, they "are very prone to follow the slightest indication of bias or prejudice upon the part of the trial judge." *In re Parkside Housing Project*, 290 Mich at 600 (quotation marks and citation omitted). See also *Bigge*, 297 Mich at 70 ("It is well known that jurors in a criminal case may be impressed by any conclusion reached by the judge as to the guilt of the accused."). It is possible for a court to deprive a party of a fair trial without intending to do so if the manner in which the judge conducts the case gives "a plain exhibition to the jury of his own opinions in respect to the parties . . . ." *Young*, 364 Mich at 559 (quotation marks and citation omitted). See also *Wheeler v Wallace*, 53 Mich 355, 357-358; 19 NW 33 (1884) ("It is, nevertheless, possible for a judge, however correct his motives, to be unconsciously so disturbed by circumstances that should not affect him, as to do and say, in the excitement of a trial, something, the effect of which he would not at the time realize, and thereby accomplish a mischief which was not designed."). Therefore, it is not necessary to impute to the judge any intentional bias; on the contrary, the initial assumption is that a trial judge designs to be impartial. See *Wheeler*, 53 Mich at 358. To ensure an appearance of impartiality, a judge should not only be mindful of the substance of his or her words, but also the manner in which they are said. See *Cole*, 349 Mich at 196-200; *Brown v Walter*, 62 F2d 798, 800 (CA 2, 1933) ("Justice does not depend upon legal dialectics so much as upon the atmosphere of the court room, and that in the end depends primarily upon the judge."). A judge should avoid questions that are intimidating, argumentative, or skeptical. See *People v Wilder*, 383 Mich 122, 124; 174 NW2d 562 (1970). Hostile questions from a judge are

12

particularly inappropriate when the witnesses themselves have done nothing to deserve such heated inquiry. See *Cole*, 349 Mich at 199 ("The record [did] not disclose any action or tone of voice on the part of the witness which in anywise threatened the orderly conduct of the trial. It would seem that the trial judge could have dealt with these matters with less heat."). A judge must proceed with particular care when engaging with a criminal defendant. *Id*. at 196. Judicial questioning might be more necessary when a judge is confronted with a difficult witness who refuses to answer questions posed by attorneys or repeatedly responds to those questions with unclear answers, although the manner of judicial involvement remains at the center of the examination by a reviewing court. *McMillian*, 405 F3d at 410.

We recognize that appellate courts typically do not have the benefit of viewing a trial judge's tone and demeanor first hand. However, in certain circumstances, the very nature of the words used by the judge can exhibit hostility, bias, or incredulity. See *Cole*, 349 Mich at 197-200 (noting that several interjections by trial judge tended "to belittle defendant's lawyer in the presence of the jury" or exhibited "rather more emotion on the part of the trial judge than the records seem to warrant"). Additionally, as occurred in the instant case, an objection by trial counsel may specifically note the inappropriateness of the judge's demeanor in the courtroom, further aiding the appellate court in understanding the tenor of judicial involvement.

Third, a reviewing court should consider the scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein. *Freudeman*, 702 F3d at 328. In a long trial, or one with several complicated issues posed to the jury, for instance, it may be more appropriate for a judge to intervene a greater

13

number of times than in a shorter or more straightforward trial. *McMillan*, 405 F3d at 410. Likewise, given the principle that a judge's questions may serve to clarify points that are obscure or confusing, *Simpson*, 328 Mich at 564, a judge's inquiries may be more appropriate when a witness testifies about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand.

Fourth, and in conjunction with the third factor, a reviewing court should consider the extent to which a judge's comments or questions were directed at one side more than the other. *Freudeman*, 702 F3d at 328. Judicial partiality may be exhibited when an imbalance occurs with respect to either the frequency of the intervention or the manner of the conduct. See *Cole*, 349 Mich at 188-189 (finding judicial intervention unacceptable when the record contained 16 pages of both extensive and heated cross-examination by the trial judge of the defendant's witnesses, but no similar examination of the prosecution's witnesses). In *Young*, 364 Mich at 558-559, this Court noted that we have "not hesitated to reverse for new trial when the trial judge's questions or comments were such as to place his great influence on one side or the other in relation to issues which our law leaves to jury verdict."

Lastly, the presence or absence of a curative instruction is a factor in determining whether a court displayed the appearance of advocacy or partiality. The model jury instructions—both for civil and criminal trials—emphasize that a judge's comments, rulings, and questions do not constitute evidence and that the jury should not attempt to discern the judge's personal opinion while considering the case. See M Civ JI 2.04(2)(b) and (c); M Crim JI 2.4(1); M Crim JI 2.8. Additionally, during the course of a proceeding, a trial judge has the ability to issue a curative instruction immediately in

14

response to conduct that could give rise to the appearance of bias. Because "[i]t is well established that jurors are presumed to follow their instructions," *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998), a curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct. Depending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the judge. That said, in some instances judicial conduct may so overstep its bounds that no instruction can erase the appearance of partiality. *In re Parkside Housing Project*, 290 Mich at 599-600 ("Although the trial judge repeatedly told the jury that he was present only in an advisory capacity, and that the determination of the verdict was solely in its hands, and in spite of a fair charge to the jury further emphasizing such statements at the conclusion of the hearing, we are of the opinion that the effect of his observations and conduct of the proceeding was too vitiating and prejudicial to defendants' rights to be thereby corrected.").

## C. REMEDY

When the issue is preserved and a reviewing court determines that a judge has pierced the veil of judicial impartiality, a structural error has been established that requires reversing the judgment and remanding the case for a new trial. *Fulminante*, 499 US at 309-310 (recognizing the deprivation of the right to an impartial judge as a structural error and explaining that "[t]he entire conduct of the trial from beginning to end is obviously affected . . . by the presence on the bench of a judge who is not impartial"); *Rose v Clark*, 478 US 570, 577; 106 S Ct 3101; 92 L Ed 2d 460 (1986) ("Despite the strong interests that support the harmless-error doctrine, . . . some constitutional errors

15

[including adjudication by a biased judge] require reversal without regard to the evidence in the particular case."); *Chapman v California*, 386 US 18, 23 & n 8; 87 S Ct 824; 17 L Ed 2d 705 (1967), citing *Tumey v Ohio*, 273 US 510; 47 S Ct 437; 71 L Ed 749 (1927); *People v Anderson (After Remand)*, 446 Mich 392, 404-405; 521 NW2d 538 (1994) (recognizing the deprivation of the right to an impartial judge as a structural error). Judicial bias creates a "structural defect[] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards." *Fulminante*, 499 US at 309-310 (stating further that judicial partiality is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself"); *Rose*, 478 US at 578 ("Harmless-error analysis . . . presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury."). The right to an impartial judge is so fundamental that " 'without [this] basic protection[], a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Fulminante*, 499 US at 310, quoting *Rose*, 478 US at 577-578.[5]  Such structural error requires reversal without regard to the evidence in a particular case. *Chapman*, 386 US at 23 & n 8, citing *Tumey*, 273 US 510; *Wallace v Bell*, 387 F Supp 2d 728, 738 (ED Mich, 2005) ("Certainly, the trial record confirms the state court's finding that the prosecution's case was strong; but once the court determined that the trial judge's actions exhibited

---

[5] The same is true of judicial bias which infects a civil proceeding.  *Marshall v Jerrico, Inc*, 446 US 238, 242; 100 S Ct 1610; 64 L Ed 2d 182 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.").

16

bias, reversal and a new trial is the only permissible consequence."). Accordingly, judicial partiality can never be held to be harmless and, therefore, is never subject to harmless-error review. *Fulminante*, 499 US at 309-310, citing *Tumey*, 273 US 510. The conviction must be reversed "even if no particular prejudice is shown and even if the defendant was clearly guilty." *Chapman*, 386 US at 43 (Stewart, J., concurring). To this extent, we overrule *People v Weathersby*, 204 Mich App 98; 514 NW2d 493 (1994), and all other cases applying harmless-error analysis to questions of judicial partiality.

In this case, as detailed in Part IV of this opinion, defense counsel objected on multiple occasions to the judicial questioning of defendant's expert witness. We therefore conclude that the issue is preserved and harmless-error review is inapplicable.[6]

## IV. APPLICATION

Having clarified the appropriate standard by which to review a claim of judicial partiality, we now apply that standard to the facts of this case. We review the trial judge's conduct according to the five factors delineated in our standard, taking care to note that consideration of additional factors may be necessary and appropriate in other cases.

---

[6] The Court of Appeals majority concluded that defendant "failed to preserve all, but one, of his claims" and therefore applied plain-error review to the judicial questioning of defendant's expert. *Stevens* (opinion of the Court), unpub op at 2-5. The Court of Appeals dissent, however, detailed several instances in which defense counsel objected to the judge's questioning of the expert and also noted that further objection "would have been futile," given that the trial judge clearly indicated to counsel that he considered all the court's questions appropriate. *Stevens* (SERVITTO, J., dissenting), unpub op at 2-7. After reviewing the record, we agree with the dissent that defense counsel objected repeatedly and comprehensively to the judge's questioning of defendant's expert, and therefore find the issue preserved and plain-error review inapplicable.

17

## A. NATURE OF THE JUDICIAL INTERVENTION

We first consider the nature of the judicial conduct. Defendant argues that the trial judge's questioning of defense witnesses demonstrated partiality.

In particular, defendant challenges the trial judge's repeated questioning of defendant's expert, Dr. Shuman, to which defense counsel objected vigorously at trial. Early in his direct examination, Shuman testified, "I think you heard testimony that the brain sloshes around. The brain doesn't slosh around. It would be like trying to scramble an egg by shaking it." The judge then stepped in:

> *The Court*: Would you be surprised if I told you that an expert didn't testify in this case that [an] infant's brain was sloshing around like an egg?
>
> [*Dr. Shuman*]: I saw Dr. Mohr's testimony, she said the brain sloshed around.
>
> *The Court*: Okay, so you think because one pediatrician said that . . . that's just your opinion, correct?
>
> [*Dr. Shuman*]: I'm just trying to educate the jury on that's not how it works.
>
> *The Court*: Okay. And now, you would agree with me that other pathologists might have very different views than your[s] . . . correct?

This conduct is problematic for several reasons. First, the judge undermined Shuman's testimony by suggesting that another witness offered contradictory testimony. Second, in emphasizing that Shuman's testimony was only his opinion and contrasting it with the opinion of other pathologists, the judge undermined the substance of Shuman's testimony as well as his overall credibility. Third, the phrase "you would agree with me" implies that the judge had his own opinion on whom to credit. In this way, the judge laid

18

"undue stress upon particular features of a witness' testimony that might, in the eyes of the jury, tend to impeach him." *Simpson*, 328 Mich at 564.

Almost immediately following this exchange, the judge questioned why Shuman had traveled a great distance to testify for defendant:

> *The Court*: I have another question for you. Have you ever traveled so far to testify?
>
> [*Dr. Shuman*]: Yes.
>
> *The Court*: Okay, how often and how far did you go?
>
> [*Dr. Shuman*]: Well, I've testified in --

Defense counsel then asked to approach, but the judge denied the request, to which counsel responded:

> Well, your Honor, just for the record I believe that that particular question is inappropriate. I -- it's clear that this is a court appointed medical examiner. The fact that he traveled from Florida to Michigan has absolutely no bearing in this case.

We agree with defense counsel that this question was inappropriate. The inquiry insinuated that Shuman traveled unusually far just to testify for defendant, arousing suspicion about his motives or why defendant could not procure a local expert to substantiate his defense.

Moreover, just thereafter, the judge targeted Shuman's qualifications:

> *The Court*: But, Dr. Shuman, as I understand it, you're an assistant pathologist, correct, you're not -- not the pathologist at Dade County are you?

19

Defense counsel objected, noting that the court had already endorsed Shuman as an expert. The judge replied, "Mr. Kirkpatrick, if I have a question I can ask a question, all right?" The judge continued:

> *The Court*: Okay, and all things being equal do you think a head pathologist is more qualified to testify by way of experience or do you think an assistant pathologist is more qualified to testify by way of experience?
>
> [*Dr. Shuman*]: I -- I wouldn't make that determination based on just being a head versus an assistant.
>
> *The Court*: Okay. All things being equal, would you agree with me that -- that generally head pathologists reach the top of their profession because they have the most experience or the least experience?
>
> [*Dr. Shuman*]: Well no, no. I mean, it -- I know pathologists that are head pathologists that have less experience than I do.
>
> *The Court*: Okay, does your head pathologist of Dade County have more or less experience than you do?
>
> [*Dr. Shuman*]: He has more.
>
> *The Court*: He has what?
>
> [*Dr. Shuman*]: He has more but I've trained pathologists who are head pathologists in other areas.

Nothing about this inquiry clarifies unclear testimony or aids the jury in understanding complex or additional pertinent information. Rather, the judge *again* interjected himself into direct examination and engaged in pointed cross-examination that targeted the witness's credentials, thereby invading the prosecutor's role. The questions were intimidating and argumentative, so much so that the witness was put on the defensive to vouch for his own qualifications. Especially given that the judge had already endorsed Shuman as an expert, extensive questioning about Shuman's motives

and qualifications fell outside the bounds of permissive judicial conduct. See *Cole*, 349 Mich at 199-200. Furthermore, the judge's response to defense counsel's objection seemed to reflect an erroneous belief that his power to question had no limitations.

Finally, the trial judge questioned Shuman about the basis for his medical conclusions in this case. During direct examination, the judge asked Shuman if it was critical to look at all the investigative reports when performing an autopsy. Then, during cross-examination, after Shuman stated that he had not viewed the reports in this particular case, the judge interrupted the prosecutor:

> Why didn't you do that in this case then? Why didn't you ask to get the police reports or talk to Detective Boulter? If that was important in that short fall case . . . why didn't you do it in this one?[7]

In doing so, the judge again improperly invaded the prosecutor's role. See *Cole*, 349 Mich at 196. The questions suggested that Shuman was not thorough in his analysis and therefore his conclusions should not be trusted. It is also notable that the judge intervened in the middle of the prosecution's line of cross-examination, challenging the witness himself rather than allowing the prosecutor to do so. Thus, on numerous occasions, the trial judge intervened in a manner that exceeded the scope of permissive judicial questioning. As a result, this factor weighs in favor of finding it reasonably likely that the judge improperly influenced the jury by creating the appearance of advocacy or partiality against defendant.

---

[7] The judge later added, "I mean, is it any -- when you're going to rule out any suspicious death isn't looking at the police reports a critical part of determining the forensic aspect of pathology?"

21

Defendant also takes issue with judicial questioning that occurred during the direct examination of defendant himself. While the judge's questioning of defendant's expert alone was sufficient to pierce the veil, we note that the judge's hostile questioning of defendant contributed to the overall appearance of advocacy or partiality. Immediately after defendant testified that he tripped over the toy truck, the judge intervened:

> *The Court*: Okay. Why did you pick this alleged truck up and not put it in the toy box, as I recall your testimony, was somewhere in the -- in the bedroom, you said you took it?

> \* \* \*

> *The Court*: . . . [W]hat happened to the truck that you allegedly tripped and lost your balance on?

> [*Defendant*]: I -- I left it there. I didn't move it.

> *The Court*: So you left it on the floor. Would it have been there when Detective Boulter came in and did a physical inspection?

> [*Defendant*]: I believe so, unless it was cleaned up beforehand, I don't know.

We note that this interjection occurred early in defense counsel's direct examination of defendant, before counsel could thoroughly develop the testimony and before the prosecutor had the opportunity to challenge the validity of defendant's version of events. Instead, the judge himself intervened and quickly seemed to question defendant's explanation. While the use of the words "alleged" and "allegedly" can be interpreted in multiple ways,[8] the context of the judge's question—and especially the fact

---

[8] For instance, a judge who consistently uses the word "allegedly" when referring at trial to a contested fact question, regardless of which witness is testifying, may not be exhibiting bias but instead may be deferring to the judgment of the factfinder in resolving

22

that the judge never used these words in his interaction with any other witnesses—suggests the judge's disbelief in the defendant's testimony. These questions did not clarify a confusing point or elicit additional relevant information. Rather, the questions inappropriately exhibited disbelief of the defendant. See *Young*, 364 Mich at 558. The fact that the judge intervened in this manner before the prosecutor's cross-examination is even further indication that the judge improperly invaded the prosecutor's role. See *id*. Even if this exchange, on its own and in a different context, would not raise questions of impartiality, this exchange provides further support for defendant's claim of judicial bias.

## B. TONE AND DEMEANOR

We also consider the tone and demeanor the judge displayed in front of the jury. It will often be the case that analysis under this factor will dovetail with analysis of the nature and type of judicial conduct; the manner in which the judge's inquiry is made will affect how the jury perceives the conduct. To the extent that it is appropriate, these factors may be considered together.

As noted earlier, in several instances the very words and sequence of questions employed by this judge projected incredulity, bias, and hostility. For example, the judge's use of the phrase "that's just your opinion" when questioning Shuman obviously indicated the judge's personal disbelief of the witness and encouraged the jury to disregard Shuman's professional opinion. When questioning Shuman about why he had not reviewed the police reports, the judge asked three questions in immediate succession

_____

that question. As always, the proper interpretation depends on the context of the interactions.

23

without giving the witness the chance to respond, indicating aggression and antagonism. Additionally, at several points, the judge engaged in prosecutorial cross-examination of Shuman, further highlighting the biased nature of the intervention. An objection by defense counsel made outside of the presence of the jury further elucidates the atmosphere pervading the courtroom:

> Your Honor, with all due respect, I'd like to make a record. This is my expert witness and I take exception and object. I understand the Court has the ability to ask questions of an expert but I believe it is objectionable and I believe that it crosses the line when it appears as though the Judge, who is the impartial overseer of this trial, is cross-examining my expert as if you are the prosecuting attorney. Because that sends a message to the jurors to immediately disregard what he's saying.
>
> And I'm getting that feel, your Honor, and if I'm getting that feel I believe the jury's getting that feel. You're aggressively asking him questions, you are downgrading the fact that he's got to travel across this country, you're insinuating to the jury that he's coming -- we couldn't find somebody in Detroit or Flint, we got to bring somebody all the way from Florida, you're destroying his credibility in front of the jury before they even have an opportunity to hear him fully testify. And I take -- and I object to it. I think it's improper.

This objection highlights the judge's inappropriate manner. Additionally, the judge unquestionably displayed hostility toward defense counsel when he responded to another objection with, "Mr. Kirkpatrick, if I have a question I can ask a question, all right?" Finally, the judge's use of the words "alleged" and "allegedly" when questioning defendant clearly indicated that the judge doubted defendant's testimony. While evidence of the judge's tone and demeanor may not be on the record in many claims of judicial bias, when it does appear, it provides further information to determine whether a defendant is entitled to a new trial. There is such evidence in this case. Therefore, this

24

factor also weighs in favor of holding that the judge improperly created an appearance of bias against defendant.

## C. SCOPE OF THE CONDUCT IN LIGHT OF THE TRIAL'S COMPLEXITY

Next, we consider the scope of the judicial conduct in the context of the length and complexity of the trial, as well as the complexity of the issues therein. This was an eight-day murder and child-abuse trial involving testimony from several medical experts. Despite the presence of multiple expert witnesses, a review of the record confirms that the complexity of the issues presented did not warrant the extent of the judicial intervention that occurred.[9] The testimony from the medical experts did conflict over whether Kian's injuries pointed toward homicide as the cause of death or instead could support defendant's claim that he accidentally dropped Kian. However, both counsel fully developed the differing expert viewpoints in clear, understandable fashion. It was well within the capacity of the jurors to weigh the relatively straightforward testimony to determine the cause of death without judicial intervention. Therefore, the information presented in this trial did not warrant the degree to which the trial judge intervened.

## D. DIRECTION OF INTERVENTION

In tandem with assessing the judge's conduct in light of the trial's length and complexity, it is also important to consider whether this intervention was directed toward a particular party, so as to distinguish excessive but ultimately neutral questioning from *biased* judicial questioning. A review of the record here indicates that the judge's

---

[9] As acknowledged by the prosecutor in his closing argument, "This is not a difficult case as far as [the] evidence . . . ."

questioning was directed against the defendant and in favor of the prosecution. First, we note that the questions were imbalanced in number: the judge questioned defendant's witnesses far more extensively than the prosecution's witnesses.[10] Furthermore, when the judge did ask questions of a prosecution witness, the inquiry often appeared to be designed to further weaken defendant's case. For instance, the judge asked several questions of Anderson related to past incidents of domestic violence with defendant. The judge then asked the prosecution's expert on domestic violence, "[W]hy is it sometimes difficult for women to extricate [themselves] or leave situations, even potentially when their children could be at risk?" Thus, the judge seemed to be using two of the prosecution's witnesses in tandem to tarnish defendant in the eyes of the jury. Likewise, when the prosecution called Dr. Jentzen as a rebuttal witness, the judge asked:

> Okay, Doctor, as forensic pathologist, and I guess an anatomical one as well, why is it important [i]f a death is either suspicious or suspected to be a homicide, why is it important to you that you review the police reports and have access to the detective and access, as an example, to any supplemental breaking reports in the investigation?

The judge also asked Jentzen to reiterate that he was a head medical examiner, not an assistant. Following immediately on the heels of the judge's criticism of Shuman, these questions used Jentzen's rebuttal testimony to further undermine Shuman's credibility. Thus, even when questioning the prosecution's witnesses, the judge in fact

---

[10] In addition to Anderson, Dr. Mohr, and Dr. Jentzen, the prosecution called two police detectives, two public safety officers, an expert on domestic violence, Anderson's step-mother, and defendant's ex-girlfriend. Of several witnesses, the judge did not ask any questions at all. Of the two officers, the judge asked a few clarifying questions about the timing of an interview and the process of making a police report.

26

adversely targeted defendant's case. In contrast to the aggressive, undermining judicial examination of defendant and Shuman, no prosecutorial witness was subject to such hostile intervention. In other words, not only was judicial questioning imbalanced in number but also in style. Accordingly, this factor also weighs in favor of holding that the judge pierced the veil of judicial impartiality.

## E. CURATIVE INSTRUCTIONS

Finally, we consider the presence or absence of curative instructions. At the close of trial, the judge provided the jury with general curative instructions to the effect that his questions and comments were not evidence, any judicial intervention was not meant to reflect a personal opinion, and the jury could only decide the case on the basis of the evidence. Because "jurors are presumed to follow their instructions," *Graves*, 458 Mich at 486, the presence of a curative instruction does tend to cut against a finding of judicial bias. Despite this presumption, however, we note that a single, general instruction may not alleviate substantial judicial bias when judicial questioning of one party is excessive and imbalanced, as it was here. See *In re Parkside Housing Project*, 290 Mich at 599-600; *Bigge*, 297 Mich at 70-72. Although the presence of a proper curative instruction weighs against the conclusion that the judge's conduct pierced the veil and deprived defendant of a fair trial, the totality-of-the-circumstances test requires that this factor be considered alongside the others.

## V. CONCLUSION

In this case involving a preserved claim of structural error, considering the totality of the circumstances, we conclude that it is reasonably likely that the judge's conduct

27

with respect to defendant's expert witness improperly influenced the jury by creating the appearance of advocacy or partiality against defendant.[11]  The nature of the judicial conduct, the judge's tone and demeanor, and the direction of the judge's questions in light of the trial's complexity all indicate that the judge exhibited judicial bias in the presence of the jury.  Although the judge gave a curative instruction to the jury, this instruction was not enough to overcome the bias the judge exhibited against the defense throughout the trial.  Consequently, we reverse the judgment of the Court of Appeals and remand for a new trial before a different judge.

Richard H. Bernstein
Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

---

[11] Because we decide this case on the grounds of judicial partiality, we decline to address the other issues raised by defendant on appeal.