*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WATKINS, Minors.

UNPUBLISHED
March 16, 2023

No. 361203
Oakland Circuit Court
Family Division
LC No. 2021-883211-NA

Before: MURRAY, P.J., and RIORDAN and YATES, JJ.

PER CURIAM.

In this child protective proceeding, respondent mother appeals as of right the trial court's order asserting jurisdiction over three of her minor children, ASW, ASW, and SHW,[1] pursuant to MCL 712A.2(b)(1) and (2). We affirm.

## I. FACTUAL BACKGROUND

Children's Protective Services (CPS) became involved with this family after an accidental positional asphyxia of respondent's five-day-old son, DW, in 2019. DW was found unresponsive in his bassinet in respondent's bed. CPS and the Department of Health and Human Services drew up a petition asking the trial court to review several safety concerns regarding respondent's other four minor children based on a history of incidents, including one of the children being born with amphetamine withdrawal. This case was delayed due to the COVID-19 pandemic and difficulty in complying with the notice requirements under the Indian Child Welfare Act and the Michigan Indian Family Preservation Act. By the time a preliminary hearing occurred in March 2021, other incidents required additional CPS investigations. In one instance, respondent's two-year-old child, ASW, wandered out of her home unsupervised. On another occasion, ASW and ASW were found

---

[1] Respondent's child, KDH, is not at issue in this appeal because, before the petition was filed in 2019, KDH was placed in his father's primary custody with no supervision of respondent due to unrelated incidents. Also, respondent's parental rights to her second-oldest child, TDW, are not at issue because TDW was placed with his father, thereby obviating the need for court intervention.

unsupervised in a hotel hallway. Despite these incidents, respondent was able to maintain custody of her children throughout the delay.

Respondent finished a Families Together Building Solutions program, she enrolled in Life Skills assistance, and she received substance-abuse treatment that yielded negative drug screens. Unfortunately, those successes did not improve respondent's ability to care for her children. The police were again called when one of the younger girls escaped the home while respondent napped. Ultimately, CPS modified the petition to seek jurisdiction over the children after respondent gave birth to another child, SHW, suffering from opioid withdrawal. As a result, ASW and ASW were placed with a relative because their father was incarcerated and SHW was placed in foster care.

During the course of respondent's pregnancy with SHW, she received treatment from Dr. Robert Brummeler, who prescribed Xanax (alprazolam) for anxiety, Adderall for attention deficit hyperactivity disorder, and Suboxone to reduce opioid cravings and withdrawal symptoms. Since respondent was unaware she was pregnant until 25 weeks, Dr. Brummeler advised her to wean off her medications, but not stop them abruptly, because sudden discontinuation could harm her and the unborn child. Additionally, respondent received treatment from an obstetrician-gynecologist and a maternal-fetal-medicine specialist. Respondent claimed that by the time SHW was born, she had completely stopped taking Adderall, nearly stopped taking Xanax, and had replaced Suboxone with Buprenorphine.

At the adjudication phase, respondent opted for a trial by jury on the petition that requested jurisdiction over the minor children. During trial, the trial court asked respondent several questions about when she first learned that she was pregnant with her youngest child, the process for weaning off her medications, and the alleged continuation of her menstrual period during pregnancy. The court also questioned Dr. Brummeler. In closing argument, the lawyer-guardian ad litem (LGAL) stated that the children's fate was in the jurors' hands. The jury found that respondent, when able to do so, had neglected or refused to provide proper care for her children's safety, health, or morals, and that her children were also subject to a substantial risk of harm to their mental well-being. The jury also found that the children's home environment was an unfit place to live due to respondent's neglect, cruelty, drunkenness, criminality, or depravity. Therefore, the court exercised jurisdiction over the children pursuant to MCL 712A.2(b)(1) and (2). This appeal followed.

## II. LEGAL ANALYSIS

On appeal, respondent insists that the trial court displayed partiality in asking questions of respondent and her primary care physician. In addition, respondent contends that the LGAL made improper arguments by asserting that the jury should consider disposition-related matters and by appealing to the jurors' moral obligation to the children. We will address these issues in turn.

## A. JUDICIAL IMPARTIALITY

Respondent claims the trial court's excessive questioning of witnesses at trial (principally respondent and Dr. Brummeler) pierced the veil of judicial impartiality, thereby depriving her of a fair trial. "The question whether judicial misconduct denied [respondent] a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

Under MRE 614(b), the trial court "may interrogate witnesses, whether called by itself or by a party." Also, Canon 3(A)(12) of the Michigan Code of Judicial Conduct permits a judge to "intervene in a trial of a case to . . . clear up some obscurity, but the judge should bear in mind that undue interference, impatience, or participation in the examination of witnesses . . . may tend to prevent the proper presentation of the cause, or the ascertainment of truth in respect thereto." The canon further states that, "[i]n addressing counsel, litigants, or witnesses, the judge should avoid a controversial manner or tone." *Id*. Judicial misconduct "deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. A trial judge's "conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the [trial] judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171. Inquiry into such conduct "requires a fact-specific analysis." *Id*. "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Id*. "Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors . . . within the context of a given case, i.e., the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole." *Id*. at 171-172. Our inquiry must involve factors "including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and the issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions." *Id*. at 172.

Here, the first and longest instance of judicial intervention involved the court's questioning of respondent about when and how she discovered that she was pregnant with SHW and how she consulted with her physicians about the pregnancy. Respondent initially stated that she informed Dr. Brummeler of her pregnancy in November 2020, but then she contradicted herself by stating that Dr. Brummeler informed her of her pregnancy after taking a blood test. After petitioner told respondent that Dr. Brummeler's records indicated that respondent informed Dr. Brummeler of the pregnancy, respondent stated she might be confusing her various pregnancies. Respondent's testimony on this point was not clear. She contradicted herself and then suggested an explanation for the contradiction. Respondent's cooperation with medical treatment to help her unborn child avoid the effects of drug withdrawal was a central issue at the trial. The nature of the trial court's questions about how, where, and when respondent learned of her pregnancy were simply intended to clarify respondent's contradictory testimony regarding that important issue.

The trial court also asked respondent about her initiation of the weaning-off process for her medications after she learned of her pregnancy. The trial court asked her if she was prescribed a lower dosage on the day of the visit, which she denied. The court determined that Dr. Brummeler prescribed 84 pills of Xanax for each 28-day period. The court asked respondent when she started taking fewer than three pills a day. She replied: "Immediately, I started cutting myself back." The court asked similar questions about her Adderall dosage. Respondent stated that Dr. Brummeler did not reduce her prescribed quantity of 56 pills every 28 days, but respondent "started breaking them to half's and quarter's to where there was none[.]" The court then asked: "What about the Suboxone?" Respondent answered that "he switched me from Suboxone to Buprenorphine." The trial judge's questions were framed to elicit information about how respondent started the weaning-off process, which was unclear when the judge intervened. To be sure, the court's initial questions revealed skepticism that Dr. Brummeler would merely advise respondent to reduce her medication

intake without also reducing the prescription quantities. But the court subsequently acknowledged that there may be medical reasons why Dr. Brummeler would elect not to reduce respondent's full prescription. Then the court reframed its questions to probe what Dr. Brummeler might have said about risks associated with reducing the Xanax prescription. Respondent was not sure, but recalled Dr. Brummeler mentioning a risk of seizures from coming off of Xanax medication. Ultimately, Dr. Brummeler corroborated respondent's testimony.

The trial court also asked respondent about her claim that she continued to have menstrual periods during her pregnancy. The court remarked that the male attorneys were "kind of delicate" in questioning respondent on this subject. The nature of the judge's questions about respondent's menstrual cycle is problematic. Respondent had already given clear, unambiguous, and detailed testimony that in the first five months of her pregnancy, she experienced cyclical bleeding that was indistinguishable from her normal menstrual cycle in terms of duration and quantity of bleeding. Respondent asserts that the court's repetition of previously asked questions displayed its disbelief in respondent's testimony, bolstering petitioner's theory that respondent knowingly concealed her pregnancy from Dr. Brummeler so that she would not have to decrease her medication. Although the trial court suggested that it asked more questions about this subject because the male attorneys were too "delicate" in their questions, petitioner's female attorney also questioned respondent on the subject. The trial court delved deeper into this topic by verifying that respondent understood and agreed that "spotting" meant "just a little bit of blood on a pad over a long period of time." The court commented that everyone may not know the difference. The trial court might have been concerned that jurors would confuse spotting with regular menstruation, but the court's questions were not limited to that issue. Moreover, some of the court's statements were not questions, but a repetition of respondent's testimony. The court's questions had the effect of improperly revealing its disbelief in respondent's testimony. See *Stevens*, 498 Mich at 174; see also *People v Swilley*, 504 Mich 350, 377-378; 934 NW2d 771 (2019). But the nature of respondent's testimony must also be considered. Respondent's testimony that her menstrual cycle continued normally for five months of pregnancy seemed extraordinary. Considering the context of the brief questioning on this subject, the jury was not reasonably likely to view the court's questioning as an expression of advocacy for petitioner or against respondent, but merely an attempt to verify the accuracy of prior testimony that appeared to defy established medical principles.

The trial court also questioned Dr. Brummeler, asking whether respondent ever said before November 4, 2020, "that her children were removed from her home so she was struggling." Dr. Brummeler replied: "She had had problems with CPS off and on, yes." The doctor remembered that respondent discussed that with him before November of 2020. Respondent contends that this question "strategically" suggested to the jurors that respondent was motivated to lie to her doctor. We disagree that the court's question and Dr. Brummeler's response were of an insidious nature. Indeed, jurors were unlikely to be surprised that the physician treating respondent for depression, anxiety, and substance abuse knew about stressors in her life. They were unlikely to infer that Dr. Brummeler's knowledge of respondent's CPS history motivated her to conceal her pregnancy.

In sum, the nature of the trial court's questions to witnesses was largely benign. The court elicited details about respondent's dosages, how she decreased her dosages starting in November, and whether Dr. Brummeler decreased her prescriptions. Those questions clarified information or filled in gaps. The repetition of respondent's testimony about her continued menstruation during her pregnancy tended to reveal the trial judge's disbelief of the testimony, but the testimony itself

was highly questionable as a matter of science and human experience. Moreover, we do not detect anything in the transcripts suggesting the court's tone and demeanor were hostile, argumentative, or overtly incredulous. The court may have revealed disbelief by repeating questions, but there is no basis to infer a sarcastic or belittling attitude. Respondent's attorney described the trial court's questioning as "extreme," but counsel did not indicate that the court was either contemptuous or disrespectful. Beyond that, the trial court's questions were just a small part of a trial that included three full days of testimony. Moreover, respondent's testimony was, at times, contradictory and defied common knowledge, so the additional questioning was understandable. Finally, the judge instructed the jury as follows at the beginning of the trial:

> I may ask questions of some of the witnesses. These questions are not meant to reflect my opinion about the evidence. If I ask questions, my only reason would be to ask about things that may not have been fully explored.

In its final instructions, the court similarly stated:

> My comments, rulings, questions, and instructions are also not evidence. It is my duty to see that the trial is conducted according to the law and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of the facts, and you should decide this case from the evidence.

These instructions dispelled any appearance of partiality. In sum, it is not reasonably likely that the trial court's conduct improperly influenced the jury by creating an appearance of advocacy for petitioner or against respondent.

## B. LAWYER-GUARDIAN AD LITEM'S CLOSING ARGUMENT

Respondent asserts that the LGAL improperly argued during closing argument that the jury should find jurisdiction so that petitioner could provide services for the children, thereby depriving her of a fair trial. To the extent that the LGAL's argument may be reviewed for impropriety, *In re Miller*, 182 Mich App 70, 77-79; 451 NW2d 576 (1990), we must consider the challenged remarks in context to decide whether respondent was denied a fair and impartial trial. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). At a trial concerning statutory grounds for jurisdiction, "the lawyer-guardian ad litem for the child may make a recommendation to the finder of fact regarding whether one or more of the statutory grounds alleged in the petition have been proven." MCR 3.972(D).

After discussing the evidence presented and the burden of proof, the LGAL concluded with the following comments:

> Bottom line is this. When you go back and deliberate, think about the future. All we're asking is to allow this Court to take jurisdiction and provide services. The only way they could be ordered to provide – participate in services is by this Court taking jurisdiction of the case, of the children. Their future is in your hands. Thank you.

An argument appealing to civic duty or sympathy "unfairly encourages jurors not to make reasoned judgments." *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003). Consequently, the LGAL's comments that the jurors should "think about the future" and that the children's future "is in your hands" were arguably improper because they suggested that the jurors should intervene for the children's good.

But taken in context, any error was brief and isolated in an argument that otherwise focused upon the standard of proof and the evidence. Moreover, the trial court's instructions made it clear to the jurors that they should not consider what might happen to the children. The court instructed the jurors "not to concern yourselves with what will happen to . . . the children if you should find that one or more of the statutory grounds alleged in the petition have been proven." The court also stated that its exercise of jurisdiction "does not necessarily mean that they will be removed from their home or made wards of the court either temporarily or permanently." The court noted that if the jury found that the court had jurisdiction, the court would then "decide at a later time what to do about these children and their family" and that "[t]here are many options available to the Court." Therefore, viewing the isolated remarks in the context of the LGAL's otherwise-proper argument and the trial court's instructions mitigating the objectionable nature of the LGAL's comments, see *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009) ("Curative instructions are sufficient to cure the prejudicial effect of most inappropriate . . . statements."), respondent was not denied a fair trial.

Affirmed.

/s/ Christopher M. Murray
/s/ Michael J. Riordan
/s/ Christopher P. Yates