# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

VICKIE ROSE HAMLIN,

Defendant-Appellant.

UNPUBLISHED
December 10, 2015

No. 321352
Ingham Circuit Court
LC No. 13-000924-FH

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BARBARA ELLEN CARTER,

Defendant-Appellant.

No. 322207
Ingham Circuit Court
LC No. 13-000917-FH

Before: SAWYER, P.J., and M. J. KELLY and SHAPIRO, JJ.

SHAPIRO, P.J. (*concurring in part and dissenting in part*)

I concur in the majority's affirmance of defendants' trespass convictions. I would, however, reverse the resisting and obstructing convictions for the reasons stated below.

These cases arise from defendants' protest at an Enbridge Energy (Enbridge) pipeline construction site located at Grimes Road and Dexter Trail in Stockbridge, Michigan. On July 22, 2013, defendants Vickie Hamlin and Barbara Carter, along with numerous additional protestors, went to the pipeline construction site to protest against the Enbridge project. Ingham County Sheriff's Office Detective Ryan Cramer testified that when he arrived on scene around 6:00 a.m. he observed about 40 individuals on the property. He stated that he was approached by someone claiming to be a negotiator for the group, who told him she did not have permission to be on the property. He testified that when he activated the overhead lights on his vehicle several individuals scattered.

-1-

Cramer testified that he initially arrested eight people for trespassing and that, after that, four people remained on the property, attached to separate pieces of machinery on separate portions of the property. It is undisputed that defendant Carter and Lisa Leggio[1] fastened themselves to each other and a front end loader using a device known as a "sleeping dragon."[2] Further, at a separate location along the pipeline, defendant Hamlin and William Lawrence[3] fastened themselves to each other and to an excavator using a similar device. Cramer testified that he told them that they were trespassing and asked them to remove themselves from the equipment and leave the property, but they did not leave. Ingham County Sheriff's Office Sergeant Melissa Brown responded to the scene following Cramer's call for backup. She also spoke with defendants, but they did not release themselves, so the Michigan State Police cut team was called to remove them from the machinery. Defendants were then taken into police custody.

## I. SUFFICIENCY OF THE EVIDENCE

Defendants argue that there was insufficient evidence to support their convictions for resisting and obstructing a police officer.

MCL 750.81d(1) provides that an individual is guilty of resisting and obstructing if she "assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties." The word "obstruct" is statutorily defined to include "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." MCL 750.81d(7)(a). In this case, the only theory presented to the jury was whether defendants failed to comply with a lawful command from a police officer.[4] Thus, the question on appeal is whether Brown issued a "command" to defendants.

---

[1] Leggio was also convicted of trespass and resisting and obstructing a police officer during the same trial. She has not appealed.

[2] The device consisted of a tube covered in duct tape, chicken wire, and tar. Defendant Carter and Leggio both had an arm in the tube and were secured to each other by a loop of rope or cord. The device was further secured to construction equipment on the property.

[3] The charges against Lawrence were apparently resolved by plea agreement.

[4] Although the jury was instructed on the full definition of "obstruct," the verdict form only allowed for a conviction based on the failure to obey a lawful command and that was the only theory the prosecutor presented. Further, the jury specifically inquired whether they could consider if there was a "physical interference" and was instructed that they were not to consider it. The prosecution agreed with the judge's instructions to that effect. Defendants' actions in securing themselves to machinery and refusing to release themselves may have constituted a physical interference with the police officer's ability to effectuate the arrest for criminal trespass. However, whether or not the jury could have convicted on this basis is not before this Court given the prosecution's express waiver of it and the court's instructions.

The word "command" is not statutorily defined and caselaw provides no elucidation as to its meaning. "When statutory terms are undefined, we interpret the terms according to their plain and ordinary meaning, and may consult dictionary definitions to accomplish this task." *People v Juntikka*, ___ Mich App ___, ___; ___ NW2d ___ (2015); slip op at 2. As defined in relevant part by *Random House Webster's College Dictionary* (2001), "command" means (1) "to direct with specific authority; order;" (2) to "require authoritatively; demand;" and (3) to "issue an order or orders." It is also defined as "an order given by one in authority." *Id*. Similarly, *Black's Law Dictionary* (10th ed) defines "command" as "[a]n order; a directive." An "order" is defined in relevant part as "an authoritative direction or instruction; command." *Random House Webster's College Dictionary* (2001). Thus, a police officer must specifically direct or order an individual to take a specified action before the officer's statements will constitute a command for purposes of MCL 750.81d.

The record shows that Brown never actually directed defendants to release themselves from the machinery. With regard to defendant Hamlin and Lawrence, Brown testified that when she arrived she "asked . . . if they were aware that they were on private property." She said that they smiled politely, but did not answer. In response, she said she "informed them that they were on private property and that they had the opportunity to leave without being arrested." She said that they conferred, but decided not to leave. At that point, another individual who had been standing by defendant Hamlin and Lawrence decided to leave. He was not arrested. Brown testified that after that person left, she "advised them that they were going to be arrested for trespassing." Subsequently, when asked if she gave additional "commands" to Hamlin and Lawrence, Brown testified that when it became clear that a specialty team was going to have to cut them from the machinery, she:

> gave them the opportunity to say, you are only under arrest for trespassing right now. If you release yourself from the device that you have yourself attached to, you will only receive the trespassing charge. If you do not remove yourself from your device you will be charged additionally with resisting and obstructing.

Brown testified that defendant Hamlin's response was to ask if they could confer with each other. Brown allowed them to confer. When they were done, she testified she "asked them what their decision was, if they were going to let go." She said that Lawrence advised her that they had decided they were not going to let go.

Brown testified that her final statements to defendants were recorded on the cut team's video. On the video, Brown engaged in the following colloquy with defendant Carter and Leggio:

> *Brown*: I know you saw me earlier, but I've not had the chance to come and speak with you. I've not met you ladies yet, Sergeant Brown, Ingham County Sheriff's Office. You guys have already been told that you are under arrest for trespassing, correct?
>
> *Leggio*: Uh . . . no . . . I've never been told that I am under arrest for trespassing.

*Brown:* Well, I am going to tell you right now that you are under arrest for trespassing; however, *if you guys, um, will willingly detach yourself from the piece, no additional charges will occur.*

*Leggio:* Okay.

*Brown:* You will just get the mere trespassing, if not, additional charges such as resisting/obstructing the police officer . . . will be charged.

*Leggio:* Understood.

*Brown:* I am going to give you guys one opportunity to tell me yes or no, right *but I just need to know what you intend to do you whether you need to be cut by a special team that will come out or if you guys are going to release and let go.*

*Leggio:* Cut it up.

*Carter:* (nodding)

*Brown*: Okay, cut it. [emphasis added.]

The video also shows that Brown similarly addressed defendant Hamlin and Lawrence:

*Brown*: Sergeant Melissa Brown, Ingham County Sheriff's Office, *[We're] going to give you one more opportunity to let go, or you're going to be cut out, the cut team is here*, they're ready to go, if you refuse to do that there's going to be the additional charge of resisting and obstructing, are you understanding? *You two, can I have your last decision? Are you guys willing to let go and peacefully let go, or do you need to be cut out?*

*Hamlin*: We're staying.

*Brown*: You're staying?

*Lawrence*: I'm staying.

*Brown*: You're staying? Ok. [emphasis added.]

When viewed in the light most favorable to the prosecution, there was insufficient evidence for a jury to convict defendants of obstructing Brown. The evidence was that they were told they were under arrest for trespassing, that they were *asked* to voluntarily release themselves, and that they were *warned* that if they did not comply they would be charged with resisting and obstructing a police officer. Brown's testimony further establishes that when she was asking them to voluntarily release themselves from the machinery she was hoping to *negotiate* an agreement whereby defendants would voluntarily release themselves.

There is a fundamental distinction between a command and a question or request. That distinction is often a critical one. Questions—even questions asked by uniformed police

-4-

officers—are not equivalent to a command or an order directing an individual to take a specified action. If an officer asks the driver of a vehicle if he or she will open his or her trunk, or asks a homeowner to open his or her front door and the person does so, that is considered a voluntary action, not a response to a command.[5] Similarly, although a person in police custody may request an attorney, we have held that the right to counsel is not implicated by mere ambiguous or equivocal references to an attorney and that in such a case police officers may continue questioning the detainee. *People v Adams*, 245 Mich App 226, 237-238; 627 NW2d 623 (2001) (holding that the statement, "Can I talk to him [a lawyer] right now?" was an "utterance . . . not sufficient to invoke the right to counsel and cut off all further questioning" because the context indicated that the defendant was seeking clarification regarding if and when he could speak to a lawyer).

I can see no reason why the same principle should not apply to charges that a person disobeyed a police command. The record in this case clearly established that defendants were *asked* if they would release themselves and were not given a direct unequivocal command.

One may perhaps argue that defendants should not avoid prosecution because the officers were polite enough to request, rather than command, compliance. However, commands can also be given politely and in a free society saying "no" to a police *request* is not felonious. Indeed, if someone may be charged on the basis of declining a *request* to take action, then defendants' argument that the statute is unconstitutional cannot be so readily dismissed.

Ultimately, this case, like every case, is about the application of facts and law, not about whether we wish to support the law enforcement officers or whether these defendants acted foolishly. Defendants' behavior may have been unnecessarily provocative and worthy of disapproval. However, the behavior of these particular defendants should not lead us to blur the critical line between a police request and a police command. That line is essential to the rule of law and the bedrock freedoms of our country, and it is the role of the judiciary to assure its clarity and integrity.

## II. JUDICIAL IMPARTIALITY

I also conclude that when the trial judge questioned defendant Carter at the end of cross-examination, the judge pierced the veil of judicial impartiality.

"The Sixth Amendment of the United States Constitution and article 1, § 20 of the Michigan Constitution guarantee a defendant the right to a fair and impartial trial," *People v Conley*, 270 Mich App 301, 307; 715 NW2d 377 (2006), which includes a neutral and detached magistrate, *People v Cheeks*, 216 Mich App 470, 480; 549 NW2d 584 (1996). "A judge's conduct pierces [the veil of judicial impartiality] and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *People v Stevens*, 498 Mich 162, 164; ___ NW2d ___ (2015).

---

[5] Providing, of course, that there are not other indicia of involuntariness.

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [*Id*. at 172.]

The inquiry into judicial impropriety is fact-specific and "a single instance of misconduct may be so egregious that it pierces the veil of impartiality," such as when a trial court's colloquy with a criminal defendant improperly invades the "province of the jury on the crucial issue which was theirs to decide." *Id*. at 171-172.

Here, defendant Carter testified on her own behalf. At the end of cross-examination, the trial judge asked Carter the following questions:

> *Court*: Ma'am, [Brown] asked you politely to stop this behavior and leave, was that what you said?
>
> *Defendant*: I'm sorry?
>
> *Court*: Didn't you say she asked you to leave?
>
> *Defendant*: She asked me if I would detach myself.
>
> *Court*: Did you do that?
>
> *Defendant*: No, I did not.
>
> *Court*: What is the difference between asking you and commanding you? Does someone have to say the word, I command, in order for you to understand the police officer is directing you to do something?
>
> *Defendant*: Well, I mean—
>
> *Court*: That's what you've said here.
>
> *Defendant*: I was just saying it was a question.
>
> *Court*: It was a question? Did you answer the question?
>
> *Defendant*: I did answer the question.
>
> *Court*: What did you say?
>
> *Defendant*: I said that I wouldn't detach.

*Court*. All right. So she asked you politely, and the question was, I guess, you say to leave, and you said you would not do that, and you think that she needed to command further?

*Defendant*. I politely told her that I was staying.

*Court*. You think—

*Defendant*. For reasons.

*Court*: You think she needed to command you further to leave? What did she need to do beyond asking you politely to leave? I'm just asking because you sit here and told this jury you weren't commanded anything, and I thought maybe you had some distinction I am not aware of.

*Defendant*: Well, my only point was that it was a question, and I responded to her that I, that morally I could not detach myself because I was there for a purpose. I was, I was there because I believed in what I was doing.

It is with this colloquy in mind that we must consider the *Stevens* factors. The first factor requires us to consider the nature of the judicial intervention. *Stevens*, 498 Mich at 172. Here, the broad nature of the judicial intervention—questioning of a witness by the trial court—is, of course, not itself improper. See MRE 614(b) (permitting judicial questioning of witnesses). Such questioning can "produce fuller and more exact testimony or elicit additional relevant information." *Stevens*, 498 Mich at 173. However, a judge's ability to question a witness is not unlimited. *Id*. at 174. The judge's questioning in this case did not seek clarification of a fact, but exhibited disbelief in defendant Carter's legal defense, i.e. that the words spoken by the officer were not a command. See *id*. ("It is inappropriate for a judge to exhibit disbelief of a witness, intentionally or unintentionally.").

Moreover, the force of the judge's questions was heightened because they were directed to one of the defendants. See *id*. at 175 ("A judge must proceed with particular care when engaging with a criminal defendant."). The judge's questioning telegraphed to the jury that he personally disagreed with defendant Carter's definition of "command." See *id*. at 174 (holding that a judge should "not permit his own views on disputed issues of fact to become apparent to the jury"). The effect of this questioning was further compounded by the fact that the *only* contested issue with regard to the resisting and obstructing charge was whether defendants failed to obey a lawful command. The court's questions, ultimately, "did not clarify a confusing point or elicit additional relevant information." *Id*. at 185. Instead, like the judge in *Stevens*, the judge's questioning in this case "inappropriately exhibited disbelief of the defendant." *Id*. Further, the questions undercut the defense theory on the resisting and obstructing charge that no command had been given. The fact that the judge intervened in this matter at the end of defendants' proofs while questioning one of defendants on an issue that went to the heart of the more serious charge is a further indication that the judge's questioning was improper. This factor weighs heavily in favor of a finding of judicial partiality.

Next, a reviewing court should consider the judge's tone and demeanor. *Id*. at 172. Here, Hamlin's trial counsel indicated that "when the court went over it again and again both in frequency and in the tone, the raising of the voice on the word command overly emphasized that, in essence, [the judge was] telling the jury that a request or a question is a command." Moreover, "the very words and sequence of questions employed" indicated that the judge believed defendant Carter's testimony lacked credibility. See *id*. at 186. The judge's statement "I'm just asking you because you sit here and told this jury you weren't commanded anything, and I thought maybe you had some distinction I am not aware of," clearly exhibits not only disbelief of defendant Carter's testimony, it also clearly indicates, as Hamlin's trial counsel pointed out, that the judge believed that a command had actually been given. Accordingly, this factor also weighs in favor of a finding of judicial partiality.

As the reviewing court we must also consider the scope of the conduct in light of the trial's complexity. *Id*. at 172. This was a two-day trial of three defendants before a single jury. The witnesses consisted solely of lay witnesses, including defendants. The testimony of each witness was fully developed by the prosecutor and the defense attorneys. Numerous questions were asked of Brown and defendants as to whether a command was given and a video of the final interaction between Brown and defendants was played for the jury. The judge's questions, although directed to the heart of the resisting and obstructing charge, were unnecessary in light of the straightforward nature of the issues and the extensive questioning that had already occurred. Accordingly, the information presented in this trial did not warrant judicial intervention severely discrediting the defense to the resisting and obstructing charges. This factor weighs in favor of a finding of judicial partiality.

It is also appropriate to consider whether the judge's intervention was directed at one side more than the other. *Id*. at 172. Here, the judge questioned both defense and prosecution witnesses. However, the court's questioning of the prosecution witnesses was brief and served to clarify issues that were not fully developed or to clarify testimony that was apparently not heard clearly by the judge. In contrast, the questioning of defendant Carter challenged her credibility and interjected the court's own opinion that a command had been given. This factor, therefore, weighs in favor of a finding of judicial partiality.

The majority largely recognizes that the judge's questioning was partial, but relies on the curative effect of the standard instruction. The court, in response to defendants request for a mistrial, stated that it would give the standard jury instruction on judicial questioning. The court, in fact, gave the following instruction:

> Questions put to witnesses are not evidence. My questions to witnesses are also not evidence. You should consider these questions only as they give meaning to the answers you receive. The answers of the witnesses supply the evidence, even on my questions.

> Now, my comments, rulings, questions, and instructions are not evidence and I have a duty to see that this trial is conducted under the law and to tell you the law that applies to this matter, but when I make a comment or give an instruction I'm not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide

this matter, pay no attention to that. You're the judges of the facts and you should decide the case from the evidence that you receive.

Jurors are presumed to follow their instructions. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). However, "in some instances judicial conduct may so overstep its bounds that *no* instruction can erase the appearance of partiality." *Stevens*, 498 Mich at 177-178 (emphasis added). Further, under the totality of the circumstances test set forth in *Stevens*, the presence or absence of a curative instruction is *only* one factor that must "be considered alongside the others." *Id*. at 190. Accordingly, although the instructions given in this case cut against a finding of judicial bias, in light of the totality of the circumstances, they were insufficient to alleviate the appearance of advocacy and partiality exhibited by the judge when he questioned defendant Carter. Moreover, this instruction is meant to assure that jurors will not *misinterpret* a judge's neutral rulings and comments as something they are not. In this case, the judge's comments and questions were *not* neutral; indeed, some jurors may have viewed them as tantamount to a directed verdict against defendants. If this standard instruction was a magic cure all, *Stevens* would not have been decided as it was.

Accordingly, based on the totality of the circumstances, the judge's questioning of defendant Carter pierced the veil of judicial partiality and constituted a structural defect for which reversal is required. See *id*. at 178-179. However, because there was insufficient evidence to convict on the resisting and obstructing charges, I would vacate those convictions. *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013).[6]

/s/ Douglas B. Shapiro

---

[6] However, as noted at the outset of this opinion, I concur in the majority's analysis of the trespass charge. Further, I would not find that the court's questioning showed judicial partiality with respect to the charge of trespassing, which is distinct from the resisting and obstructing charge. See *Stevens*, 498 Mich at 172 (holding that "[r]eviewing courts may consider additional factors if they are relevant to the determination of partiality in a particular case"). Here, the judge's questions were improper because they served to improperly influence the jury on the key issue pertaining to the resisting and obstructing charge. The questions did not cast any disbelief on defendants' theory with regard to the trespass charges. Accordingly, reversal of the trespassing charge on the grounds of judicial partiality is not required.