*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOHN HENRY GRANDERSON,

Defendant-Appellant.

UNPUBLISHED
February 18, 2020

No. 325313
Saginaw Circuit Court
LC No. 14-039760-FC


PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TERRANCE DEMON-JORDAN THOMAS, JR.,

Defendant-Appellant.

No. 325530
Saginaw Circuit Court
LC No. 14-039757


ON REMAND

Before: JANSEN, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

These cases return to this Court on remand from the Michigan Supreme Court, which has directed that the appeals of two codefendants, John Henry Granderson and Terrance Demon-Jordan Thomas, Jr., be reconsidered in light of our Supreme Court's decision in *People v Swilley*, 504 Mich 350; 934 NW2d 771 (2019), to grant a new trial to a third codefendant, Kareem Amid Swilley, Jr. See *People v Granderson*, ___ Mich ___; 935 NW2d 359 (2019) (Docket No. 325313); *People v Thomas*, ___ Mich ___; 935 NW2d 359 (2019) (Docket No. 325530). On remand, in Docket No. 325313, we reverse Granderson's convictions and sentences, and remand to the trial court for a new trial. Likewise, in Docket No. 325530, we reverse Thomas' convictions and sentences, and remand to the trial court for a new trial.

-1-

# I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the shooting death of DaVarion Galvin. Galvin was shot around 2:30 p.m. on November 21, 2012, while walking down a sidewalk with three other men: Willie Youngblood, Joshua Colley, and Marcus Lively. In *Swilley*, 504 Mich at 356, our Supreme Court explained:

> A dark-colored Saturn approached the group, and the occupants of the vehicle opened fire. Colley and Lively took cover, and they were not shot. Youngblood was struck once in the stomach but fled the scene and survived. Galvin was struck by multiple bullets and died in the hospital shortly thereafter. The police found nine-millimeter and .40-caliber shell casings at the location of the shooting. The car used in the drive-by shooting was later recovered, and a fingerprint on the vehicle matched that of . . . Granderson.

The issue presently before this Court involves the trial court's extensive questioning of witnesses during trial. Relevant here is the trial court's questioning of Colley. *Id*. at 360-370. Our Supreme Court characterized the trial court's questioning as follows:

> During its case-in-chief, the prosecution also called Colley, who had been with Galvin when Galvin was shot. More than two months after the shooting, Colley was interviewed by the police about what had occurred on that day. Colley provided a statement describing the vehicle and its approach. Colley indicated that he saw three people with guns lean out the window, and he described what happened as bullets were flying. But Colley told the police that he was unable to identify any of the people in the vehicle. Colley was shown a photo array containing images of [Swilley, Granderson, and Thomas], but he did not make an identification.

> During direct examination at trial, Colley changed his account. Contrary to his earlier statement, Colley testified that he, in fact, never saw the car from which shots were fired. He instead claimed that he was texting on his phone when he heard gun shots, hit the ground, and then "blacked out." When the prosecutor confronted Colley with his earlier statement, Colley claimed that he could not remember the details contained within the statement because he was high on drugs at the time of the shooting. He claimed that the information in the statement was based on what others had told him. Colley also testified that neither he nor Youngblood knew who the shooters were: "I told him I don't know. I said I asked him. He said he didn't know. So he never – he never seen no faces, man." After direct examination, cross-examination by all of the defense attorneys, redirect examination, recross-examination, and a second redirect examination by the prosecutor, the judge indicated that he too had some questions.

> First, the judge sought to confirm with one of the attorneys the length of Colley's statement. After being informed that it was 38 pages long, the judge confronted Colley:

*The Court*. Thirty-eight pages. So you talked to these police officers for 38 pages, and they've asked you about all these questions and answers that you gave, and you're saying now none of that is correct?

*[Colley]*. I don't remember none of that, sir. Like I said, I told you all what I remember. I was high from Promethazine, Codeine, marijuana and Xanax. That cause some blackouts.

*The Court*. But one of your dear friends, your home boys as you called him, was murdered that day in front of you –

*[Colley]*. Right.

*The Court*. – laying [sic] on the ground bleeding to death, and you believe it's important to talk to the police after and let them know what you know happened?

*[Colley]*. Right.

*The Court*. And you did talk to them and you heard what you told them at that time.

*[Colley]*. But I was going on what somebody else had told me.

*The Court*. Did you at any time in that statement tell them, I don't – that I don't know what happened?

*[Colley]*. No.

*The Court*. You didn't say hey, I don't know, I don't know, I don't know, I don't know. You gave these other answers, correct?

*[Colley]*. I told you, man. I was high off Promethazine, Codeine, marijuana and Xanax.

Not finished, the judge then asked the prosecutor directly, "Did anyone in that statement . . . did he – did he give a response, I don't know, I was high [?]" Defense counsel for . . . Granderson interjected that he did not believe it was procedurally correct to ask the prosecutor such a question, but the judge insisted that he could ask questions to "shorten this up." The judge returned to Colley, stating "Are you saying that when these questions were asked of you at [sic] the officer back at the time you gave the statement you said, I don't know, I was high?" Colley began, "Listen, I –" but was interrupted by the judge as follows: "That wasn't your answer was it?" Colley said, "No, I was going on what somebody else told me." The judge replied, "Did you tell them that?" Colley admitted that he had not.

-3-

Next, the judge inquired into gang associations, first asking whether Colley was friends with [Swilley, Granderson, and Thomas]. Colley responded that they were not and that it had surprised him that [Swilley, Granderson, and Thomas] were charged because no one had known the identifies of the shooters. The judge then asked, "So, you have no problem if Ranger – excuse me, if Officer Shaft, excuse me, were to put you in cells with [Swilley's rival gang]?" Colley answered that he would not have a problem. The judge instructed the prosecutor to redisplay a photograph that allegedly showed several individuals making gang signs. Defense counsel [for Swilley] objected: "Your Honor, with all respect, I've got to object to this. It appears to me as though the judge is taking the role of the prosecutor." The judge replied: "Not at all. I have no interest in this case and the outcome. I've instructed you on that before, I'm instructing you again, and the Court is entitled to ask questions. I'm entitled to summarize the evidence if I want, and I'm not doing that." The judge proceeded to ask Colley what his friends were doing with their hands in the photographs, and Colley answered that they were just making signals. The judge concluded, "I don't have anything further." [*Swilley*, 504 Mich at 367-370.]

Ultimately, Granderson was convicted of one count of first-degree premeditated murder, MCL 750.316, one count of conspiracy to commit premediated murder, MCL 750.157a, three counts of assault with intent to murder (AWIM), MCL 750.83, one count of carrying a dangerous weapon with unlawful intent, MCL 750.225, and six counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Granderson was sentenced, as a second-offense habitual offender, MCL 769.10, to life without parole for the murder conviction, life with parole for the conspiracy to commit murder conviction, 46 to 69 years' imprisonment for each AWIM conviction, and 36 to 90 months' imprisonment for carrying a dangerous weapon, to be served consecutively to six concurrent terms of two years' imprisonment for each felony-firearm conviction.

Thomas was also convicted of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, three counts of AWIM, one count of carrying a dangerous weapon with unlawful intent, one count of possession of a firearm by a felon (felon-in-possession), MCL 750.224f, and seven counts of felony-firearm. Thomas was sentenced to life without parole for conspiracy to commit murder and first-degree murder convictions, 29 to 45 years' imprisonment for each AWIM conviction, and 60 to 90 months' imprisonment for carrying a dangerous weapon with unlawful intent and felon-in-possession convictions. The foregoing sentences were to be served consecutively to seven concurrent terms of two years' imprisonment for each of Thomas' felony-firearm convictions.

Both Granderson and Thomas appealed to this Court. See *People v Granderson*, unpublished per curiam opinion of the Court of Appeals, issued September 13, 2016 (Docket No. 325313). On direct appeal to this Court, Granderson argued: (1) the evidence was not sufficient to support his convictions; (2) gang-related photographs were not admissible; (3) certain witnesses should not have been permitted to testify as both fact witnesses and expert witnesses; (4) a video of Youngblood's statement to police was improperly admitted into evidence as a prior inconsistent statement; (5) evidence concerning a drive-by shooting of Swilley's home on December 25, 2012, and subsequent events was erroneously admitted, (6) admission of a statement made by Lively at

the scene of Galvin's shooting violated Granderson's right to confront the witnesses against him; (7) various claims of instructional error; and (8) several claims of prosecutorial misconduct. This Court concluded none of Granderson's claims were meritorious, and affirmed his convictions and sentences. *Granderson*, unpub op at 4-14.

Similarly, on direct appeal to this Court, Thomas argued through appellate counsel and a Standard 4 Brief on Appeal: (1) Youngblood's statement to police should not have been admitted as a prior inconsistent statement; (2) the trial court admitted irrelevant evidence; (3) it was error to sentence Thomas to life without parole for conspiracy to commit first-degree murder; (4) the prosecutor knowingly presented false testimony from Youngblood at trial; (5) Thomas' convictions were against the great weight of the evidence; (6) trial counsel was ineffective for failing to seek separate trials; and (7) the trial court's questioning of Colley and a police officer, Detective John Beyerlein, pierced the veil of judicial impartiality. This Court concluded that only the sentencing issue raised by Thomas had merit, reasoning that it was erroneous to sentence Thomas to life *without* parole for conspiracy to commit murder pursuant to *People v Jahner (After Remand)*, 433 Mich 490; 466 NW2d 151 (1989), and remanded for correction of Thomas' sentence. *Id*. at 14-22.

Granderson and Thomas sought leave to appeal this Court's decision to our Supreme Court. In an order dated May 31, 2017, our Supreme Court granted leave. *People v Granderson*, ___ Mich ___; 895 NW2d 510 (2017). However, because only Thomas raised the issue of judicial questioning of witnesses, the Saginaw County Prosecutor was only directed to respond to that issue as it pertained to Thomas. *Id*. Apparently taking notice that our Supreme Court was concerned about claims of judicial partiality in this case, Granderson filed a motion in our Supreme Court on July 5, 2017, and for the first time asked to file a supplemental brief adding a claim that the trial court's questioning of Colley pierced the veil of judicial impartiality.

Meanwhile, codefendant Swilley had also filed an application for leave to appeal in our Supreme Court, and on September 27, 2018, our Supreme Court entered an order directing arguments to be held on the application. *People v Swilley*, 503 Mich 868 (2018). That same day, the Court entered orders holding the applications filed by Granderson and Thomas in abeyance pending a decision in Swilley's appeal. See *People v Granderson*, ___ Mich ___; 917 NW2d 407 (2018); *People v Thomas*, ___ Mich ___; 935 NW2d 359 (2018). The order in Granderson's case noted that his motion to file a supplemental brief remained pending. *Granderson*, ___ Mich at ___.

Our Supreme Court issued its decision in *Swilley* on July 17, 2019. *Swilley*, 504 Mich at 350. The Court concluded that the trial court had pierced the veil of judicial impartiality through its questioning of Philip Taylor, an alibi witness who testified on behalf of Swilley. *Id*. at 370-393. Although the *Swilley* opinion discusses Colley's testimony at length, our Supreme Court explained in a footnote:

> As detailed in this opinion, we conclude that the trial judge's treatment of Taylor created the appearance of advocacy or partiality against [Swilley]. To reach this conclusion, we considered the totality of the circumstances, evaluating the judge's treatment of other witnesses, including . . . Colley. See [*People v*] *Stevens*, 498 Mich [162,] 164; 171-172[; 869 NW2d 233 (2015)]. However, because the judge's

-5-

treatment of Taylor is enough to satisfy defendant's claim of judicial impartiality, we need not determine whether the judge's treatment of . . . Colley would have served as [a] separate bas[is] for concluding that the judge pierced the veil of judicial impartiality. [*Swilley*, 504 Mich at 392 n 17.]

Our Supreme Court reversed Swilley's convictions and sentences, and remanded the matter to the trial court for a new trial. *Id*. at 392-393.

On November 27, 2019, the Court entered orders remanding Granderson's and Thomas' appeals to this Court "for reconsideration in light of *Swilley*." *Granderson*, ___ Mich at ___; 935 NW2d at 359; *Thomas*, ___ Mich at ___; 935 NW2d at 359. Further, the Court granted Granderson's motion for leave to file a supplemental brief, and pursuant to MCR 7.305(H)(1), the application was again considered and lieu of granting leave to appeal, the matter was remanded to this Court for reconsideration in light of *Swilley*. *Granderson*, ___ Mich at ___; 935 NW2d at 359.

## II. STANDARD OF REVIEW

The sole remaining issue in this case is whether the trial judge's questioning of Colley pieced the veil of judicial impropriety, thereby depriving Granderson and Thomas of a fair trial.

> The question [of] whether a judge's conduct has "denied a defendant a fair trial is a question of constitutional law that this Court reviews de novo." *Stevens*, 498 Mich at 168. "When the issue is preserved [by objecting to the trial judge's questioning at trial] and a reviewing court determines that the trial judge's conduct pierced the veil of judicial impartiality, the court may not apply harmless-error review." *Id*. at 164. Rather, "once a reviewing court has concluded that judicial misconduct has denied the defendant a fair trial, a structural error has occurred and automatic reversal is required." *Id*. at 168, citing *Arizona v Fulminate*, 499 US 279, 309; 111 S Ct 1246; 113 L Ed 2d 302 (1991). [*Swilley*, 504 Mich at 370 (footnote omitted).]

## III. ANALYSIS

As directed by our Supreme Court, we reconsider the issue before us in light of *Swilley*, and we now conclude that the trial judge did pierce the veil of judicial impropriety in questioning Colley. According both Granderson and Thomas are entitled to new trials.

As the Supreme Court stated in *Swilley*:

> In *Stevens*, this Court established the appropriate standard for determining when a trial judge's conduct in front of a jury has deprived a party of a fair and impartial trial. "A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 164. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

-6-

Evaluating the totality of the circumstances is a fact-specific analysis that involves a consideration of various factors. *Id*. at 171-172. The *Stevens* Court instructed:

> In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id*. at 164.]

Because this list of factors is nonexhaustive, a reviewing court "may consider additional factors if they are relevant to the determination of partiality in a particular case." *Id*. at 172. "[T]he aggrieved party need not establish that each factor weighs in favor of the conclusion that the judge demonstrated the appearance of partiality for the reviewing court to hold that there is a reasonable likelihood that the judge's conduct improperly influenced the jury." *Id*. "The reviewing court must consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case." *Id*. "Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors." *Id*. at 171-172. [*Swilley*, 504 Mich at 370-371.]

## A. DOCKET NO. 325530

We begin our analysis of this issue by addressing the Thomas' appeal in Docket No. 325530, as it is the simpler appeal to resolve. In this Court, Thomas argued that the trial court pierced the veil of judicial impropriety through its questioning of two witnesses: Colley and Detective Beyerlein. We only address the questioning of Colley, however, as it is sufficient to resolve this appeal.

Thomas preserved this issue by objecting to the trial judge's questioning of Colley during trial. Indeed, trial counsel for Thomas joined an objection first made by Swilley's counsel, that the trial judge's questioning was prosecutorial in nature. Therefore, if error occurred, it is automatic that Thomas will receive a new trial. *Swilley*, 405 Mich at 370.

True, our Supreme Court in *Swilley* granted Swilley a new trial based on the trial court's questioning of Taylor. However, the Court examined Colley's testimony, provided in relevant part *supra*, in detail. Therefore, we rely on the Court's analysis in reaching our conclusion that the trial judge's questioning was improper.

The first factor to be considered in our analysis is the nature of the trial court's conduct. *Id*. at 371. In this case,

> several aspects of the judge's examination of Colley were not clarifying in nature but were, instead, argumentative, reflected skepticism, and undermined the witness's credibility. See *Stevens*, 498 Mich at 174-175; [*People v*] *Wilder*, 383

-7-

Mich [122,] 124[; 174 NW2d 562 (1970)]. Colley testified that he did not see the vehicle approach, did not see the occupants inside the car, and did not remember what happened during the shooting itself, all in contrast to details provided in his prior statement. This could be considered a weakness in Colley's trial testimony, one that the prosecution indeed emphasized during its examination of the witness.

However, the judge inappropriately participated in the adversarial process by engaging the witness in a way that further emphasized this potential weakness: "So, you talked to these police officers for 38 pages, and they've asked you about all these questions and answers that you gave, and you're saying now none of that is correct." The judge then underscored his own disbelief of Colley's explanation: "But one of your dear friends, your home boys as you called him, was murdered that day in front of you[.]" … [T]he judge's subsequent inquiry employed recognizable cross-examination techniques, with the judge posing leading questions in a way that cast further doubt on Colley's trial testimony. At one point, the judge even invited the prosecutor to weigh-in, asking the prosecutor directly whether Colley had ever told anyone that he was high at the time of the shooting. The inappropriateness of this solicitation was immediately recognized and objected to by … Granderson's defense counsel.

And finally, as he had done with Taylor, the judge again targeted a witness's underlying motive for testifying in defendant's favor. The trial judge implied that Colley was scared of [Swilley, Granderson, and Taylor], posing his own subtle threat to Colley to make this point: "So you have no problem if . . . Officer Shaft . . . were to put you in cells with [defendant's rival gang]?" This intimidating question and severe attitude toward the witness was patently inappropriate. See *Stevens*, 498 Mich at 174-175; *Wilder*, 383 Mich at 124; Canon 3(A)(12). As with [other witnesses], it was the prosecution's job to highlight any incredible, unsubstantiated, or contradictory aspects of Colley's testimony, but it was not within the purview of the judge. See *Stevens*, 498 Mich at 174-175. [*Swilley*, 504 Mich at 379-380.]

We agree with our Supreme Court that the nature of the trial judge's questioning of Colley weighs in favor of judicial partiality.

The next factor to consider is the tone and demeanor of a trial judge. *Id*. at 371. Our Supreme Court analyzed this factor with respect to the trial judge's questioning of Colley as follows:

[T]he [trial] court took an intimidating, threatening tone with Colley, asking whether he would be willing to be placed in a cell with allegedly rival gang members. In other places, the judge's comments were obviously skeptical of Colley's testimony. As had been the case with Taylor, the judge posed several leading questions, culminating with questions that revealed the judge's personal disbelief: "You didn't say, hey, I don't know, I don't know, I don't know, I don't know. You gave these other answers, correct?" On a few occasions, the judge interrupted Colley to drive home a point—that Colley had not told anyone that he

was high at the time of the shooting—but what these exchanges drive home to us is the judge's incorrect belief that his purview included witness impeachment. A judge should avoid the interruption of attorneys or witnesses, except to clarify. See *Stevens*, 498 Mich at 174. In this case, the judge did not take such care. [*Swilley*, 504 Mich at 385-386.]

We agree that the trial judge's tone when questioning Colley was "hostile, argumentative, and prosecutorial." *Id*. at 386. This factor, too, weighs in favor of judicial partiality.

Third, we consider the "scope of judicial intervention within the context of the length and complexity of the trial, or any given issue therein." *Id*. at 386 (quotation marks and citation omitted). Our Supreme Court in *Swilley* expressly critiqued the conclusion previously reached by this Court when applying this factor to the facts of this case. Indeed, the Court opined:

> In applying this factor to this case, the Court of Appeals seems to have misunderstood the full extent of our directive. The Court of Appeals concluded that extensive judicial questioning was appropriate solely because this trial was a "long and complex one" that spanned 18 days and involved eyewitness testimony, expert witnesses, DNA evidence, and other scientific analysis. *Granderson*, unpub op at 22. This is an incomplete application of our instruction in *Stevens*. In *Stevens*, we did note that in a long or complicated trial, "it may be more appropriate for a judge to intervene a greater number of times than in a shorter or more straightforward trial." *Stevens*, 498 Mich at 176. However, the focus is not solely on whether the trial itself was long or complicated. The Stevens Court explained that an appellate court must consider "the scope of the judicial conduct in the context of the length and complexity of the trial, as well as the complexity of the issues therein." *Id*. at 187-188 (emphasis added). In other words, a reviewing court should not simply evaluate whether the trial as a whole was long or involved complicated issues. A reviewing court must also evaluate the complexity of the particular issues that were subject to judicial inquiry. "[A] judge's inquiries may be more appropriate when a witness testifies about a topic that is convoluted, technical, scientific, or otherwise difficult for a jury to understand." *Id*. at 176 (emphasis added). In contrast, when a witness testifies on a clear or straightforward issue, judicial questioning is less warranted, even if the testimony occurs within the context of a lengthy trial, or one that involves other complex but unrelated matters. Said differently, when testimony deals with a particular issue or topic that is not complicated or complex, the utility of judge-led questioning is more limited.
>
> Applying this factor correctly leads to a different result than that reached by the Court of Appeals. [*Swilley*, 504 Mich at 386-387 (footnote omitted).]

In light of the foregoing, we reconsider Colley's testimony, and agree with our Supreme Court that ". . . Colley's testimony was [not] complex." *Id*. at 387 n 15. Indeed,

> Colley testified about factual matters in a way that arguably contradicted his prior statement. The prosecution was well-positioned to challenge these relatively basic inconsistencies, and the jury was fully able to come to its own conclusions on the

matter, without judicial involvement. Nevertheless, the judge confronted Colley repeatedly, in argumentative fashion. This, too, was unwarranted. [*Id*. at 387-388 n 15, citing *Stevens*, 498 Mich at 176.]

Again, this factor weighs in favor of judicial partiality.

The fourth factor considers whether the trial judge's comments or questions were one-sided. *Swilley*, 504 Mich at 388. Because judicial partiality is shown "when an imbalance occurs with respect to *either* the frequency of the intervention *or* the manner of the conduct[,]" the "inquiry is therefore twofold: in order to determine whether judicial questioning was imbalanced, a reviewing court must evaluate *both* the frequency of the questions *and* the manner in which they are asked." *Id*. (citation and quotation marks omitted).

In addressing this factor, our Supreme Court noted that the trial judge's "questions were imbalanced in both frequency and manner." *Id*. at 389-390. Indeed, the trial judge engaged Colley in "a skeptical manner." *Id*. In fact, when engaging with all defense witnesses, or "defendant-friendly prosecution witnesses, the judge's questioning was frequent, as well as combative, hostile, and designed to impeach." *Id*. Our Supreme Court went on to highlight,

> [t]he prosecution's side of the case, however, was not subjected to equal judicial treatment. The judge asked a limited number of questions of prosecution-friendly witnesses, and the questions asked were generally clarifying in nature. Of particular note is the court's treatment of Youngblood, a key witness for the prosecution. Youngblood, like Colley, provided arguably inconsistent testimony, making representations at trial that conflicted with his earlier statements. But in contrast to the judicial barrage of questions aimed at Colley, who testified favorably, . . .the judge did not ask a single question of Youngblood. This discrepancy highlights the imbalance that occurred in this case. [*Id*. at 389.]

We agree with our Supreme Court that the trial judge's questioning was imbalanced in favor of the prosecution in both in frequency and in manner, which supports a conclusion of judicial partiality. *Id*. at 390.

Finally, we must consider whether the trial court's curative instructions nonetheless ensured that Thomas received a fair trial. *Id*. We conclude that they did not. As explained by our Supreme Court:

> On the facts of this case, these instructions cannot cure the judicial bias that was shown throughout the trial. Although the preliminary instruction indicated that the judge would limit his inquiry to clarifying questions, the judge did not follow through on this assurance. As already described, the judge repeatedly challenged defendant's favorable witnesses in a manner that was not clarifying but, instead, combative and prosecutorial. This gave little meaning to the judge's preliminary and final instructions that he did not intend to express an opinion.

> Even the judge's instructions during witness testimony could not right the ship given the extent and inappropriate nature of the questioning. . . . [D]uring Colley's testimony . . . the judge stated that he had no interest in the case's outcome,

[yet] the judge engaged Colley in an impermissible fashion that suggested that the judge did indeed have an opinion on several aspects of Colley's testimony. The judge's comment during Colley's testimony that he was entitled to ask questions resembled more of a rebuke of defense counsel and a declaration of judicial authority, rather than a curative instruction. Indeed, such language was eerily similar to the language we criticized in *Stevens*, 498 Mich at 182, wherein the judge declared, " '[Defense counsel], if I have a question I can ask a question, all right?' " The judge's statement during Lee's testimony also resembled more of a curt retort than a curative action when the judge declared that he was "entitled to ask questions" and that he "could care less" about the outcome of the case.

In essence, the judge's words repeatedly conflicted with his actions. Therefore, the judge's instructions did not cure his impermissible conduct. See *Stevens*, 498 Mich at 177-179; *In re Parkside*, 290 Mich [582,] 599-600[; 287 NW 571 (1939).] [*Swilley*, 504 Mich at 390-392.]

As we hope the foregoing analysis makes abundantly clear, the trial judge, in questioning Colley, not only pierced, but tore to shreds the veil of judicial impartiality. This structural error entitles Thomas to a new trial. Accordingly, we reverse Thomas' convictions and sentences, and remand to the trial court for a new trial.

## B. DEFENDANT GRANDERSON

Although the foregoing analysis regarding whether the trial judge's questioning pierced the veil of judicial impartiality also applies completely to Granderson, the resolution of the issue in this appeal is not as clear cut. True, defense counsel for Granderson joined in the objection to the trial court's questioning of Colley during trial, and therefore this issue is preserved for appellate review. *Swilley*, 405 Mich at 370. However, Granderson raised this issue for the very first time in our Supreme Court in a motion to file a supplemental brief adding a claim that the trial court's questioning of Colley pierced the veil of judicial impartiality. To be clear, despite having ample opportunity to do so, Granderson never raised this issue in this Court.

This Court has a practice of not deciding issues that have not been raised on appeal. *Tingly v Kortz*, 262 Mich App 583, 588; 688 NW2d 291 (2004). See also *People v Greene*, 477 Mich 1129, 1131 (CORRIGAN, J., concurring in part and dissenting in part) (citing *Tingly* for the premise that "[g]enerally, an appellate court does not address issues that were not raised . . . on appeal." "However, this Court possess the discretion to review a legal issue not raised by the parties." *Tingley*, 262 Mich App at 588, citing *Mack v Detroit*, 467 Mich 186, 206-209; 649 NW2d 47 (2002) (stating that "[t]he jurisprudence of Michigan cannot be, and is not, dependent upon whether individual parties accurately identify and elucidate controlling legal questions").

In light of our Supreme Court's directive on remand, as well as the clearly substantive and dispositive legal issue before us, we choose to exercise that discretion here. Because this issue was preserved by Granderson in the trial court, and because the structural error in this case is clear, Granderson, like Thomas, is entitled to a new trial. Accordingly, we reverse Granderson's convictions and sentences, and remand to the trial court for a new trial.

## IV. CONCLUSION

We conclude that given the totality of the circumstances, it is reasonably likely that the trial judge's questioning of Colley improperly influenced the jury by "creating the appearance of advocacy or partiality against" Thomas and Granderson. *Swilley*, 504 Mich at 392. To be clear, we conclude,

> The nature of the judicial questioning, the judge's tone and demeanor, the scope of the intervention in light of the relatively straightforward testimony at issue, and the imbalanced direction of the intervention all support our conclusion that the judge pierced the veil of judicial impartiality. Although the judge issued several curative instructions to the jury, these instructions were not enough to overcome the partiality the judge exhibited against defendant throughout the trial. [*Id*. at 392.]

Accordingly, in Docket No. 325313, we reverse defendant Granderson's convictions and sentences, and remand this matter to the trial court for a new trial. We do not retain jurisdiction. Likewise, in Docket No. 325530, we reverse defendant Thomas' convictions and sentences, and remand this matter to the trial court for a new trial. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly