*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MAURICE DARNELL ELLIOT, JR.,

        Defendant-Appellant.

UNPUBLISHED
March 5, 2020

No. 344740
Wayne Circuit Court
LC No. 18-000776-01-FC

Before: REDFORD, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his convictions by a jury of felony murder, MCL 750.316, armed robbery, MCL 750.529, unlawful killing or torturing of animals, MCL 750.506, and possession of a firearm during the commission of a dangerous felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life imprisonment for felony murder, 15 to 30 years' imprisonment for armed robbery, one year of probation for unlawful killing or torturing of animals, and a consecutive two years' imprisonment for felony-firearm. Because of improper questioning of witnesses by the trial court, we reverse and remand the case for a new trial.

## I. FACTUAL BACKGROUND

This case arises from the robbery and murder of Clarence Reynolds at his home on Promenade Street in Detroit and the killing of his dog. On the morning of December 28, 2017, two of Reynolds's friends arrived at his house to go out for breakfast and found his front door open, its glass shattered, blood on the door, and the victim's body lying nearby on the floor. Police investigated the scene and collected forensic evidence that proved inconclusive. Police later found a red Dodge Caravan, the same make, model, and color of Reynolds's vehicle, burned, and although police recovered a video surveillance camera recording showing a man igniting the vehicle's interior, investigators were unable to determine who set the fire. Police did not recover a murder weapon. They did not find Reynolds's cellphone at the scene so they obtained and analyzed his phone records which indicated that Reynolds's phone contacted Armonee Felder five times after Reynolds's death. Reynolds's phone had never previously contacted Felder.

Police later took Felder into custody for questioning and he ultimately told them that defendant committed the robbery and murder. The prosecutor subpoenaed Felder and interviewed him regarding the statement he gave to the police. Felder revised some details of his statement but told the prosecutor that defendant told him he robbed and killed a man for a phone, a van, and some marijuana. The police arrested defendant and held him in the Detroit Detention Center.

At defendant's trial, Felder testified that, early on the morning of Reynolds's murder, defendant called him from an unfamiliar number. Felder left his girlfriend's house and returned home to find defendant and other friends there. One of them asked defendant where he got two phones. Felder testified that defendant responded that they should watch the news. Defendant also stated, "I caught a body." Felder explained that the expression meant that he killed someone. Defendant, Felder, and their friends watched a television news report about Reynolds's murder. Felder testified that defendant told him that he robbed someone for his phone, some money, and a van, and he shot the man. Felder also testified that defendant drove to Felder's house in a red Dodge van.

After defense counsel cross-examined Felder, the prosecution inquired regarding differences in Felder's written statement to police and changes he made to that statement after the prosecutor subpoenaed him. Felder explained that defendant told him the sequence of events involving the robbery and shooting. During further cross-examination, defense counsel challenged Felder regarding his statements and his identification of defendant as the perpetrator of Reynolds's murder in an attempt to establish that the police suggested to Felder that he identify defendant. When defense counsel concluded, the trial court inquired whether the jury had any questions and they indicated they did not.

The trial court then proceeded to ask a number of questions about a variety of topics. The trial court first asked Felder questions regarding a picture about which the prosecution and defense counsel had asked him questions. Felder affirmed that the police obtained the picture from social media, that it had been posted the day of Reynolds's murder, and that it depicted Felder, defendant, and their friends. Felder confirmed that the police showed him that picture when they interviewed him.

The trial court next asked the following questions:

*Q.* You've known [defendant] for like nine years.

*A.* More than ten.

*Q.* Okay. And you're how old?

*A.* Twenty.

*Q.* So would it be fair to say that you know him since elementary school?

*A.* Yes, I played football with him my whole life.

*Q.* Okay. Now, are you guys from the same neighborhood?

*A.* Yes.

*Q.* Now, let me ask you this. Do people–what do they call people that talk to the police in your neighborhood?

*A.* Snitches.

*Q.* And is it a good thing to be known as a snitch?

*A.* No.

*Q.* So how does that make you feel to be here testifying?

*A.* Like a snitch.

*Q.* Is that something that you want to be?

*A.* No.

*Q.* Has anyone–have the police threatened you or did [the prosecutor] threaten you to get you to testify?

*A.* No.

*Q.* Did anybody tell you to make something up against a person you've known since you were a little kid?

*A.* No, I just know the system and when someone involve you in something it's hard to get out.

*Q.* And who is it that involved you in something?

*A.* [Defendant].

*Q.* And what did he do that makes you say he involved you in something.

*A.* Called my phone off a dead person's phone.

The next witness called at trial, after Felder's testimony was completed, was Lorenzo McCray. He stated that, on January 5, 2018, while an inmate waiting in the detention center, he and another inmate struck up a conversation with defendant. The other inmate asked defendant why he was being held. McCray testified that defendant said the word homicide. The other inmate asked defendant if he committed the crime to which McCray heard defendant answer affirmatively and explain that he burned the vehicle and used the dead man's phone. After defense counsel cross-examined McCray, the trial court asked McCray numerous questions regarding his testimony to which he responded by repeating his testimony and providing greater detail and additional information. The trial court's questions included:

*Q*. So the defendant said–so the other Pit says, "What evidence they got?" The defendant says, "They don't got no evidence, we burnt up the car," or what else?

*A*. They said–he said they got me using the dead man's phone.

*Q*. They got me using the dead man's phone, we burnt up the car?

*A*. Yeah.

*Q*. Did he ever say the name of who it was he killed?

*A*. No.

*Q*. Did he ever say the address of who it was he killed?

*A*. No.

Following the testimony of three additional prosecution witnesses, defense counsel moved for a mistrial on the ground that the trial court's questioning of Felder regarding feeling like a snitch and yet coming forward to testify inappropriately bolstered his credibility. The trial court responded that it had the right to ask questions about anything, especially things it felt had not been fully explored and explained that it asked questions about other matters for clarification and had not advocated for either party. The trial court denied the motion but stated that it would provide the jury a curative instruction.

After the parties' respective closing arguments, during final instructions to the jury, the trial court included the following instructions:

The fact that the defendant is charged with a crime and is on trial is not evidence. The lawyers' statements and arguments and comments are not evidence. They're only meant to help you understand the evidence and each side's legal theories. You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge. The lawyers' questions to the witnesses, your questions to the witnesses, and my questions to the witnesses are also not evidence. You should consider these questions only as they give meaning to the witnesses' answers.

My comments, rulings, questions, and instructions are also not evidence. It is my duty to see to it that the trial is conducted according to the law, and to tell you the law that applies to this case. However, when I make a comment or give an instruction, I'm not trying to influence your vote or express a personal opinion about the case. Also, when I ask questions I'm not trying to influence or express an opinion about the case. You should not give greater weight to any testimony merely because it came in response to a question that was asked by me. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of the facts, and you should decide this case based on the evidence.

The jury found defendant guilty of all charged offenses. This appeal followed.

## II. ANALYSES

### A. THE TRIAL JUDGE'S QUESTIONING OF WITNESSES

Defendant argues the trial court denied him due process and violated his right to a fair trial by impermissibly bolstering Felder's credibility in favor of the prosecution. We agree.

We review de novo the question of constitutional law whether a judge's conduct denied defendant a fair trial. *People v Swilley*, 504 Mich 350, 370; 934 NW2d 771 (2019). If we determine that the trial judge's conduct pierced the veil of judicial impartiality and that judicial misconduct denied defendant a fair trial, we must conclude that a structural error occurred requiring automatic reversal. *Id.*

In *Swilley*, our Supreme Court explained that a reviewing court must consider the totality of the circumstances to determine whether "it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id.* (citation omitted). The Court instructed that we may consider several nonexhaustive factors including: (1) the nature of the judge's conduct, (2) the tone and demeanor of the judge, (3) the scope of the judge's conduct within the context of the length of the trial and the complexity of the issues, (4) whether the judge directed the conduct at one side more than the other, (5) the presence of a curative instruction at the time of misconduct or the end of the trial, and (6) other relevant factors relevant to the determination whether the conduct indicated partiality. *Id.* at 371. We must "consider the relevance and weigh the significance of each factor under the totality of the circumstances of the case" and "consider the cumulative effect of the errors." *Id.* (quotation marks and citations omitted).

Trial judges may ask witnesses questions to clarify unclear, vague, or confusing testimony. *Id.* at 372, 373. They may also "elicit additional relevant information" and "intervene in a trial to expedite matters, prevent unnecessary waste of time, or clear up an obscurity." *Id.* at 372 (quotation marks and citations omitted). "A judge's responsibilities do not include emphasizing or exposing potential weaknesses in a witness's testimony or conveying the judge's personal view on whether a witness should be believed." *Id.* at 373. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *People v Stevens*, 498 Mich 162, 171; 869 NW2d 233 (2015).

In this case, the record reflects that the trial court asked Felder questions following the prosecution and defense counsel's examinations regarding his interview with and statement to the police, his later statement to the prosecutor, his testimony at defendant's preliminary examination, and defense counsel's challenge to Felder regarding his identification of defendant and whether the police influenced his identification by showing him a photograph. The record is not clear why the trial court considered it necessary to inquire in this regard because the prosecution thoroughly examined Felder and defense counsel correspondingly cross-examined him exposing variances in his testimony. The parties presented the jury evidence from which they could consider whether

-5-

Felder testified credibly at trial. Nevertheless, the record reflects that the trial court's questioning in this regard provided some clarification of relevant facts and did not indicate partiality or bias against defendant.

The trial court, however, then inquired further eliciting testimony from Felder that elaborated that Felder and defendant were long-standing friends, that Felder's community considered a person who talked to the police a snitch, and that he felt like a snitch. This testimony suggested that Felder faced being known in his community as a snitch, and although reluctant to testify against his friend, he did so at his own peril. A reasonable likelihood exists that jurors hearing this testimony would conclude that Felder's testimony deserved greater regard because his situation and feelings warranted finding him credible despite the variances in his statements and testimony.

While the record reflects that the trial court only briefly questioned Felder on this topic, we do not find that the trial court's inquiry regarding Felder feeling like a snitch appropriately sought clarification of any facts relevant to the case or sought to elicit additional facts relevant for the jury's consideration of defendant's guilt or innocence. On the contrary, that line of questioning served to bolster Felder's credibility by exposing that he testified against his emotional, social, and personal safety interests, and therefore, must have testified truthfully. A trial court must avoid even the mere appearance of partiality and should refrain from participating in the examination of witnesses to influence the jury's ascertainment of truth. *Stevens*, 498 Mich at 174. We find nothing in the trial court's inquiry that clarified unclear testimony or aided the jury in understanding the facts of this case. *Id*. at 183.

In reviewing the totality of the circumstances of the trial, we also note the trial court conducted extensive examination of Lorenzo McCray, the incarcerated individual who testified that defendant made jailhouse admissions to him, conducting essentially an additional direct examination of this witness as well as specifically asking McCray two questions about whether defendant stated the name or address of "who it was he (defendant) killed." The trial court also asked numerous questions of James Loyd, a friend of defendant who drove defendant around the day after the homicide of Clarence Reynolds.

In examining the issue of judicial questioning in his concurring opinion in *Swilley*, Justice MARKMAN wrote:

> Judicial questioning assists the jury in its search for the truth by "supplement[ing] the parties' evidence" in at least three ways. *Id*. First, judicial questioning can clarify unclear or unresponsive testimony from a witness. *Stevens*, 498 Mich at 175-176; see also, e.g., *Ray v United States*, 367 F2d 258, 261 (CA 8, 1966) ("Where the testimony is confusing or not altogether clear the alleged 'jeopardy' to one side caused by the clarification of a witness's statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion."). Second, judicial questioning can better enable the jury to connect the evidence presented and to organize that evidence into a comprehensive whole to create a logical narrative of the allegations and events at issue. Third, judicial questioning can uncover new information that was not brought to light by the parties, whether

intentionally or unintentionally. *Stevens*, 498 Mich at 173 ("[I]t is appropriate for a judge to question witnesses to produce fuller and more exact testimony or elicit additional relevant information."). Because "the primary objective of criminal procedure is to facilitate the ascertainment of truth," *Anstey*, 476 Mich at 456 (quotation marks omitted), a trial judge should not hesitate to exercise his or her authority to question witnesses in appropriate circumstances to assist the jury in its search for the truth.

Of course, as this Court has recognized, a trial judge's authority to question witnesses is not boundless or without reasonable limits. Central to the American legal system is the proposition that the jury is the fact-finder in most criminal and civil trials, not the judge. See Const 1963, art 1, § 14; US Const, Ams VI and VII; see generally *People v Lemmon*, 456 Mich 625, 636-642; 576 NW2d 129 (1998). Indeed, in large part, "the preservation of the jury by constitutional amendment was designed as a limitation on judicial power." *Id*. at 639. "[B]ecause judges wield enormous influence over juries, judges may not ask questions that signal their belief or disbelief of witnesses." *United States v Tilghman*, 328 US App DC 258, 260-261; 134 F3d 414 (1998). See also *Stevens*, 498 Mich at 176. For the same reason, it is improper for judges to ask questions that signal their belief in the strength of the evidence presented against or in favor of a particular party. See *People v Bigge*, 297 Mich 58, 72; 297 NW 70 (1941) ("Once the door is open for allowing the opinion of the court to be impressed upon jurors that one charged with crime is guilty of the offense, the fundamental right of trial by jury is impaired."). Such questioning is inappropriate because it corrodes the independence of the jury by giving rise to the possibility that the jury's verdict is essentially the product of the judge's attitudes concerning the evidence presented, rather than the jury's evaluation of the evidence. See *United States v Perez-Melis*, 882 F3d 161, 165 (C.A. 5, 2018) ("The jury cannot be regarded as having freely come to its own conclusions about a witness's credibility when the court has already indicated, directly or indirectly, that it disbelieves his testimony.").

In summary, trial judges should bear in mind that the primary purpose served by judicial questioning is to assist the jury in its search for the truth. This search is indispensable to our justice system because "if the trial does not effectively develop the facts and comprehensibly present them to the fact-finder, trial justice is serendipitous," rather than a reliable judgment of a party's guilt or innocence. Strier, *Making Jury Trials More Truthful*, 30 UC Davis L Rev 95, 99 (1996). However, it is equally important that the trial judge assist the fact-finder without also signaling to the jury its personal views concerning the evidence presented, as even such inadvertent signaling might unduly influence the jury and thus undermine its role as an independent fact-finder. While there is undeniably a tension between these competing judicial interests, I am confident that the trial judges of this state will, subject to the imperfections that will inevitably arise in any such balancing process, serve the critical interests of truth in the criminal-justice process by exercising their questioning authority in a manner that facilitates this purpose while also preserving and maintaining the integrity of the jury process.

[*People v Swilley*, 504 Mich 350, 397-399; 934 NW2d 771 (2019) (MARKMAN, J., *concurring in the judgment*).]

For our determination whether the trial court displayed the appearance of advocacy or partiality, we must also consider the presence or absence of a curative instruction. *Stevens*, 498 Mich at 177. In *Stevens*, our Supreme Court explained:

Because it is well established that jurors are presumed to follow their instructions, a curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct. Depending on the circumstances, an immediate curative instruction may further alleviate any appearance of advocacy or partiality by the judge. That said, in some instances judicial conduct may so overstep its bounds that no instruction can erase the appearance of partiality. [*Id*. at 177-178 (quotation marks, citations, and alterations omitted).]

The record reflects that defense counsel did not object to the trial court's questioning of Felder or request a curative instruction at the time of the trial court's questioning. Later that same day when defendant moved for a mistrial, the trial court promised to provide the jury a curative instruction, but the trial court waited until it gave its final instructions to them. The late provision of a curative instruction in this case unlikely cured the problem created by the trial court. In questioning Felder as it did, the trial court pierced the veil of impartiality and violated the constitutional guarantee of a fair trial because it is reasonably likely that the testimony elicited by it influenced the jury by creating the appearance of advocacy or partiality against defendant, thereby bolstering Felder's credibility in favor of the prosecution. *Id*. at 171.

This questioning, in conjunction with the trial court's activist questioning of McCray and Loyd, did not clarify unclear or unresponsive testimony nor did it enable the jury to connect or organize testimony and evidence in a more logical and organized way. The trial court went beyond the scope of its discretion under the Constitution and laws of this state. Contrary to the trial court's belief, a trial judge lacks the right to ask questions about anything that the judge feels has not been fully explored. The prosecution's case rested substantially on whether the jury believed Felder's testimony. The trial court's questioning of Felder had the potential to improperly influence the jury in this regard, and its later instruction could not suffice to cure the likely inappropriate effect the testimony had on the jury. As a result, this exam of Felder, together with the other examinations of witnesses, violated defendant's right to a fair trial requiring reversal of defendant's convictions and remand to the trial court for a new trial.

## B. PROSECUTORIAL MISCONDUCT

Defendant also argues that he suffered prejudice because the prosecutor argued that Felder and McCray were credible witnesses since they both knew facts that were not reported on the news. We disagree.

"Issues of prosecutorial misconduct are reviewed de novo to determine whether the defendant was denied a fair and impartial trial." *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010) (citation omitted). "Further, allegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's

remarks in context." *Id.* (citation omitted). "A prosecutor may not make a statement of fact to the jury that is unsupported by evidence, but she is free to argue the evidence and any reasonable inferences that may arise from the evidence." *People v Ackerman*, 257 Mich App 434, 450; 669 NW2d 818 (2003). The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001).

During her closing argument, the prosecutor stated:

And I want you to think about when you're looking at Mr. Felder's testimony and Mr. McCray's testimony, the things that they knew that were not (inaudible). Think about that. Time of death. Now, (unintelligible) says he can't determine time of death. Time of the robbery? There are no actual witnesses to the robbery alive to tell you what time it was. The van being burned, that was not disseminated on the news. The lack of a[n] actual murder weapon, that was not on the news.

Defense counsel objected regarding what the news covered. The court overruled defendant's objection and instructed, "The jurors are to rely on their own collective memories as to what the evidence and testimony was."

The record reflects that Felder testified that defendant told him when the incident occurred and other details about it. Felder also testified that defendant drove a red van to his house on the morning of the murder and told him that he shot a man and took his van. Felder admitted that he viewed a news report after defendant urged him to do so and learned the location of the murder.

McCray denied that he watched the news. He testified that defendant told him that he burned the van and used the dead man's phone. McCray also testified that defendant told him "there was no gun, no casings." McCray stated that defendant told him that the police had no evidence. A detective testified that the news did not cover the burned van.

The record is unclear regarding the full extent of news coverage of the incident or whether the news reported that the police had not recovered a murder weapon. The jury could properly consider Felder's and McCray's testimonies and how they learned of facts relevant to the case. The prosecutor did not improperly request that the jury consider the source of Felder's and McCray's testimonies and whether they learned facts from the news or knew facts that were not made public. The prosecutor's remark that the news did not report the absence of a weapon may have been incorrect but after defense counsel objected the trial court provided a contemporaneous curative instruction to ameliorate the error. Further, in its final instructions to the jury, the trial court instructed the jury that the lawyers' statements, arguments, and comments were not evidence and that they were to consider only the witnesses' testimonies and other admitted evidence. Defendant's claim that the prosecution argued facts not in evidence during closing argument, even if true, does not warrant relief. Defendant has failed to establish that he suffered prejudice by the prosecutor's remark.

Based on the improper questioning of witnesses, principally witness Felder, the trial court erred and this error requires reversal.

We also hold that this case must be assigned to a different judge on remand. In determining whether this case should be reassigned to a different judge, we have considered the factors

articulated by this Court in *People v Hill*, 221 Mich App 391, 398; 561 NW2d 862 (1997) (quotation marks and citations omitted):

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

In this case, review of the trial transcript indicates that the trial court would have substantial difficulty setting aside its previously-expressed views of defendant's counsel and refraining from involvement in interrogating witnesses during defendant's new trial which compels us to reassign this case to a new judge on remand. After the direct and cross-examinations of witnesses, the trial court intervened and interrogated the witnesses for extended periods that likely impacted the jury's ability to fairly and objectively consider their testimonies for its decision regarding defendant's innocence or guilt on the charged offenses. Reassignment is necessary to preserve the appearance of justice and to ensure the public's confidence in the integrity of the judicial system. Reassignment to a new judge will not cause waste or duplication disproportionate to the gain obtained by preserving the appearance of fairness. Defendant, therefore, shall be retried before a different judge.

## CONCLUSION

We reverse defendant's convictions and remand this case to the circuit court for a new trial presided over by a different judge. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto